WALKER ET AL. *v.* BOARD OF COUNTY COM-
MISSIONERS OF TALBOT COUNTY ET AL.

[No. 180, October Term, 1954.]

74

76

*Decided July 27, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Hyman A. Pressman* and *Henry H. Balch* for the appellants.

*T. Hughlett Henry, Jr.,* with whom were *Z. H. Stafford, Charles E. Wheeler* and *Henry & Henry* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree denying the relief prayed in plaintiffs' bill of complaint.

Pursuant to Code, 1951, Article 66B, the County Commissioners of Talbot County, (the Commissioners), on May 16, 1953, adopted a zoning ordinance, (the Zoning Ordinance). The plaintiffs, appellants here, five property owners, as property owners filed an amended bill of complaint on February 21, 1955, against the Commissioners, the Planning and Zoning Commission, (the Commission), and the Appeal Board for the Commission,

(Appeal Board), asking for a declaratory decree declaring the aforesaid Zoning Ordinance invalid and unconstitutional in its entirety; in the alternative that the Zoning Ordinance be declared invalid and unconstitutional insofar as it affects the property of the plaintiffs; that the defendants be enjoined from enforcing said Zoning Ordinance in the use of their properties for industrial purposes; and for other and further relief.

The decree declared that the Zoning Ordinance was valid, constitutional and in full force and effect; that the Commission is legally constituted and entitled to function under the provisions of Code, 1951, Article 66B, *supra;* that the Appeal Board was legally created and is legally constituted and entitled to function as such under the provisions of Article 66B, *supra;* and requiring appellants to pay the costs of the proceedings. From that decree appellants appeal here.

The bill of complaint alleges and the appellants claim that the Commission was not legally created. Article 66B, *supra,* Section 12, provides in part; "(Personnel of the Commission.) The Commission shall consist of five members, namely, a member of the Council and four persons who shall be appointed by the mayor, and confirmed by the council, if the mayor be an elective officer, otherwise by such officer as council may in the ordinance creating the Commission designate as the appointing power. All members of the Commission shall serve as such without compensation. The term of the *ex-officio* member shall correspond to his official tenure. The term of each member shall be five years or until his successor takes office, except that the respective terms of the five members first appointed shall be one, two, three, four, and five years."

By Article 66B, *supra,* Section 10, "mayor" is defined as "the chief executive of the political subdivision, whether the official designation of his office be Mayor, City Manager or otherwise." "Council" is defined as "the chief legislative body of the political subdivision." On August 14, 1951, the Commissioners unanimously passed

Planning and Zoning Ordinance No. 1 creating the Commission and appointed five members: One, (Mr. Norman W. Harrington), for a term of one year; one for a term of two years; one for a term of three years; one for a term of four years; and one for a term of five years. They failed to name a member of the Commissioners to this Commission. It is conceded by the appellees that the Commission was originally improperly constituted. However, failure to appoint a proper Commission would not invalidate the Ordinance as a whole. Cf. *Bostock v. Sams*, 95 Md. 400, 418, 52 A. 665. Insofar as the Ordinance authorized the appointment of a Commission it could take effect at once, subject to the filling of vacancies by subsequent action of the "Mayor" and "Council". On February 13, 1952, Mr. Harrington, one of the original members of the Commission, upon entering military service was forced to resign. At that time it was discovered that a member of the Commissioners was not included on the Commission. The Commissioners then unanimously appointed Mr. Omer Dulin, the President of the Commissioners, to the Commission. Mr. Dulin was appointed to fill the unexpired term of Mr. Harrington, whose term being for one year, expired on August 14, 1952. Mr. Dulin served on the Commission as a holdover member until his term expired as County Commissioner in 1954, when he was again re-elected a County Commissioner. He has continued to serve as a holdover member up to the time of the hearing below. His term from his original appointment on February 13, 1952, has in fact corresponded with his official term as a member of the Commissioners since that time. In *Benson v. Mellor*, 152 Md. 481, 137 A. 294, a case involving the tenure of office of a County Commissioner, it was held that in the absence of a contrary intention incumbents in office rightfully hold over and perform the duties of their offices until the qualification of their successors, although there may be no express provision in the law for it. We must, therefore, hold that the legislative intent that a member of the Commissioners be a

member of the Commission was complied with on February 13, 1952.

Appellants contend that the appointments should have been made by the President of the Commissioners and confirmed by the Commissioners under Article 66B, Section 12, *supra*, and that under the Constitution of Maryland, Article 11A, Section 3, the President of the Commissioners is the chief executive officer of that body. The appointments were made and approved by the Commissioners when all members were present. If the President of the Commissioners had not agreed to those appointments, it is reasonable to assume that his disapproval would have been a matter of record. There is no record of his disapproval. From February 13, 1952, Mr. Dulin served with the other members of the Commission which is an indication of his approval of those members. We are of opinion that this was a sufficient compliance with the Enabling Act.

Appellants also complain because Mr. Norman Howeth resigned from the Commission on March 5, 1953, and his successor was not appointed until May 26, 1953. There is nothing in the record to show that the Commissioners did not act with reasonable promptness, under the circumstances, to fill the vacancy.

Appellants further allege and contend that the Appeal Board was not legally created. Code, 1951, Article 66B, *supra*, Section 22, provides in part: " (Board of Appeals.) The council shall provide for the appointment of a Board of Appeals, * * *. The Board of Appeals shall consist of three members." The minutes of the Commissioners show that on September 8, 1951, the Commissioners appointed three members to the Appeal Board. The appellants contend that because these appointments were not made by the President of the Commissioners alone, the Appeal Board was not validly constituted. The testimony shows that all the Commissioners agreed to these appointments. Therefore, the President of the Commissioners agreed to the appointments and they were confirmed by the council. As stated by the chancellor, it

seems clear from the minutes of the Commissioners that each additional appointment was to replace a retiring member. There is no evidence that appellants ever appealed to this Appeal Board.

The appellants further contend that there was no preliminary report thereon by any Planning Commission prior to a final report by such Commission nor has there been any final report by any Planning Commission prior to the enactment of the Zoning Ordinance and that there were no hearings thereon. Code, 1951, Article 66B, *supra,* Sections 21 (d) and 21 (f) provide: "21 (d) (Method of Procedure.) The council shall provide for the manner in which such regulations and restrictions and the boundaries of such districts shall be determined, established and enforced, and from time to time amended, supplemented or changed. However, no such regulation, restriction or boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. At least fifteen (15) days' notice of the time and place of such hearing shall be published in an official paper or a paper of general circulation in such municipality. * * * 21 (f). In order that the municipality may avail itself of the zoning powers conferred by this sub-title, it shall be the duty of the Planning Commission to recommend the boundaries of the various original districts and appropriate regulations to be enforced therein. Such Commission shall make a preliminary report and hold public hearings thereon before submitting its final report and the council shall not hold its public hearings or take action until it has received the final report of such commission." Mr. Dulin testified that the Commission, of which he was a member, had a meeting on April 6, 1953, and on April 7th Mr. Voshell, a member of the Commission, appeared before the Commissioners and reported to them about the meeting of the Commission on the previous evening. Mr. Voshell in his testimony read the following from the minutes of the meeting of the Commission of April 6,

1953: "The Commission reviewed the revised draft of the Ordinance of Talbot County, including the maps which had been prepared at the request of the 'Citizens Committee for Talbot County Development.' The Commission tentatively approved these drafts, subject to further consideration when a public hearing is planned." He testified that he went before the Commissioners the next day and informally presented to them what the Commission thought desirable to present at the public hearing. He said that on April 7th he went over in complete detail with the Commissioners the proposed Ordinance, the maps and what the maps showed, and the Commissioners agreed that this would be presented at the public meeting. He told them when he thought this public meeting should be held and asked their concurrence. We are of opinion that the maps and proposed Ordinance showing the tentative zoning constituted the necessary preliminary report to the Commissioners. The Enabling Act, Section 21 (f), *supra,* requires the Commission to recommend the boundaries of the districts and the appropriate regulations to be enforced therein. This preliminary report is to be submitted before a public hearing is held. We can find no provision for formal action of the Commissioners on that preliminary report or as to the form of that report. The maps and proposed Ordinance submitted appear to have been sufficient. Through the newspaper advertisement, which was published as hereinafter stated, and the reference therein to the maps and draft of the Ordinance, which were open for public inspection at the office of the Commission, the requirement for submitting the preliminary report to the public was met in that it was thus presented in usable, written form and served as a proper and adequate basis for discussion at that public meeting.

The exhibit shows that "once in each of one week beginning the 4th day of April, 1953," a notice of public hearing was published in the Easton Star-Democrat of Easton, Talbot County. This was a notice that a public hearing would be held in the Easton High School in

Easton on Monday, April 27, 1953, "* * * for the pur-
pose of presenting a draft of a master plan and zoning
ordinance for all of Talbot County, prepared to meet
specifications of the five-point program advanced by the
Citizens Committee for Talbot County Development. This
hearing is called at the request of the Citizens Commit-
tee for the purpose of presenting this plan to the County,
and determining if the county is ready to support it.
All interested persons are hereby notified of said hearing
and are invited to attend. A draft of the ordinance and
maps are available for inspection at Planning and Zoning
Commission's office in the County Building, Easton."
The minutes of the Commission show that this public
hearing was held as advertised on April 27, 1953, that
an estimated five hundred people attended, and that a
special meeting of the Commission was held immediately
following the public hearing. It was the opinion of the
Commission, Mr. Dulin voting in agreement, "that a
very great majority of those attending the open meeting
were in favor of the plan presented and those attending
represented the great bulk of the County." The Com-
mission therefore voted to recommend the plan as pre-
sented at the public hearing to the Commissioners. Ap-
pellants' objection to the meeting of April 27th seems
to be that it was conducted by the Citizens Committee
for Talbot County rather than by the Commission. Mr.
Voshell, a member of the Commission, testified that he
conducted the public hearing of April 27th. Offered in
evidence was a letter to the Commissioners from Mr.
Voshell, temporary chairman, stating that the Commis-
sion voted unanimously to recommend the plan presented
at the public hearing of April 27th and that a great
majority of those present at the meeting were in favor
of the plan. The letter further stated: "Please therefor
consider this our formal recommendation of the attached
plan and the maps dated, April 28, 1953."

The Commissioners by advertisement printed in the
Easton Star-Democrat once in each of three successive
weeks before the fifteenth day of May, 1953, gave notice

of a public meeting to be held in the Easton Armory on May 16, 1953, for the purpose of a discussion of the enactment of an ordinance, including a map of a master plan for the zoning of Talbot County. In addition to the notice of this meeting, the full text of the proposed Ordinance was published for two successive issues in the Easton Star-Democrat. At the public meeting in the Armory on May 16th approximately one thousand people were present. The large majority of those present were in favor of the proposed Ordinance. It therefore appears that the necessary public hearings were held on the Zoning Ordinance.

Code, 1951, Article 66B, *supra*, Section 17, provides in part: "Before the adoption of the plan or any such part, amendment, extension, or addition the Commission shall hold at least one public hearing thereon, notice of the time and place of which shall be given by one publication in a newspaper of general circulation in the municipality."

The testimony shows that after this second public meeting the Commissioners met and made certain very minor changes in the Ordinance. Appellants contend that the Commissioners had no power to change the Ordinance after the public meetings and that it should have been adopted in exactly the same form as there presented. Of course, the object of the public hearings was to give the public an opportunity to criticize and recommend changes in the Ordinance. It could hardly be contended that, if the Commissioners decided to make minor changes in the Ordinance, public meetings would have to be continuously held until the Ordinance was submitted in its exact final form. It is evident that these minor changes were not substantial and did not violate the intent of the Enabling Act. The same contention was made in the case of *Town of Burlington v. Dunn,* (Mass., 1945), 61 N. E. 2d 243. It was there said: "There is nothing in the statute requiring another hearing whenever, as the result of one hearing, the board decides to amend what

had previously been proposed. The amendments were not of a fundamental character."

Appellants further contend that the zoning maps are uncertain, indefinite, self-contradictory and irreconcilable. It is admitted that there are some slight errors in these maps where certain lines over-lap and minor areas contain wrong colors. The zones are "reasonably capable of comprehension." *Mallett v. Village of Mamaroneck,* 123 N. Y. S. 2d 249; *Auditorium, Inc. v. Board of Adjustment,* (Del.), 91 A. 2d 528. However, none of these defects in any way affect appellants' property. These errors could be corrected by administrative action of the Commissioners. Article 66B, *supra,* Section 21(e), provides in part: "(Changes.) Such regulations, restrictions and boundaries may from time to time be amended, supplanted, changed, modified or repealed." Such minor irregularities will not vitiate zoning ordinances. *Speroni v. Board of Appeals of City of Sterling,* 368 Ill. 568, 15 N. E. 2d 302. There is no claim here that anyone had difficulty in determining the zoning of his property.

As to the contention that the Zoning Ordinance as finally adopted did not provide for an Appeal Board and for appointment of its members, Section IX of the Zoning Ordinance provides for the powers and duties of the Appeal Board and the procedure of that Board. As hereinbefore decided, the Appeal Board was legally appointed prior to the adoption of the Zoning Ordinance on May 16, 1953. As hereinbefore stated, the Commissioners legally created the Appeal Board. There is no requirement in Article 66B, Section 22, *supra,* that the Appeal Board be created by ordinance.

Appellants interpret the first sentence of Article 66B, Section 21(d), *supra,* to require the issuance of permits and provisions for enforcement of the Ordinance and claim that there are no such provisions in the Ordinance. The section relied on says nothing about permits and provides that the Commissioners may prescribe the manner in which the regulations may be enforced. Pursuant

to Article 66B, *supra,* Section 34, Section XIV of the Zoning Ordinance provides penalties for its violation.

Of course, as contended by the appellants, powers granted to county commissioners should be strictly construed. *Barnett v. Co. Commissioners for Charles Co.,* 206 Md. 478, 112 A. 2d 492. Judge Hammond said for this Court in the case of *Crozier v. Co. Commissioners of Prince George's Co.,* 202 Md. 501, 97 A. 2d 296: "The power of the County Commissioners of Prince George's County to zone or rezone is one that they have only by statutory delegation and can be exercised only to the extent and in the manner the legislature has said that it may be. * * * The requirements of the ordinance are binding on the Commissioners sitting as a District Council and they may exercise their zoning powers only by following the procedure specified; this is implicit, if not explicit, in Sections 985 and 988 of the Prince George's County Code and Sections 4 and 5 of Article 66B of the Code (1951 Ed.). The cases spell out the necessity of substantially complying with legislative procedural and substantive prerequisites as to notice and hearings if the action of zoning authorities is to be valid. *Heath v. Mayor & C. C. of Baltimore,* 187 Md. 296, 49 A. 2d 799; *Louisville & Jefferson County Planning and Zoning Commission v. Ogden,* 307 Ky. 362, 210 S. W. 2d 771; *Watkins v. Gromley,* Sup., 59 N. Y. S. 2d 747; *Yokley, Zoning Law and Practice,* Section 79 and Section 109; and *Bassett, Zoning,* p. 36." In *Heath v. Mayor & City Council of Baltimore, supra,* the State Enabling Act and the City Zoning Ordinance required that notice be given of application for permits. The contention was made that the property had not been properly posted. This Court there said: "A substantial compliance with the requirements of an administrative regulation in making an application for a permit is sufficient. *People v. Village of Oak Park,* 268 Ill. 256, 109 N. E. 11; *State ex rel. Grimmer v. City of Spokane,* 64 Wash. 388, 116 P. 878." For the reasons herein stated we are of opinion that the

procedure followed the enabling legislation sufficiently to make the Zoning Ordinance valid.

It is strenuously contended by the appellants, adjoining property owners, that it is unconstitutional to prevent them from using their property for industrial purposes. It has been well settled in this State that, where a constitutional question is involved, equity may intervene and enjoin the action of an administrative body. This, of course, is not favored where statutory remedies permit the raising of such questions. *Kahl v. Consolidated Gas, Electric Light & Power Co.,* 191 Md. 249, 258, 60 A. 2d 754; *Francis v. MacGill,* 196 Md. 77, 75 A. 2d 91; *Kracke v. Weinberg,* 197 Md. 339, 79 A. 2d 387.

Of course, the power of the government to interfere by zoning regulations with the general rights of the land owner in restricting the character and use of his property is not unlimited and those rights are within the protection of the Constitution, Federal and State. *Eubank v. City of Richmond,* 226 U. S. 137, 57 L. Ed. 156; *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842; *State of Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, 86 A. L. R. 654; *City of Baltimore v. Cohn,* 204 Md. 523, 105 A. 2d 482. However, all uses of property which are injurious to the health, comfort, safety and welfare of society may be prohibited under the sovereign power of the state, even though the exercise of such power results in inconvenience or loss to certain persons. In those cases, individual rights are subordinate to the higher rights of the public. The exercise of this police power is an essential attribute of sovereignty. *Mugler v. Kansas,* 123 U. S. 623, 31 L. Ed. 205, 8 S. Ct. 273; *Euclid, Ohio v. Ambler Realty Co.,* 272 U. S. 365, 71 L. Ed. 303; *Zahn v. Board of Public Works,* 274 U. S. 325, 71 L. Ed. 1074; *Leventhal v. District of Columbia,* 69 App. D. C. 229, 100 F. 2d 94.

The appellants, in order to sustain their contention, presented testimony that the land sought to be industrialized consists of approximately 836 acres in the Bay

Hundred District of Talbot County adjoining the Chesapeake Bay. This land has been used for agricultural and residential purposes for many years. It has not been used for any other purposes. Thirty acres is in marsh land and a small portion is cut-over woodland. The marsh land at one time was used for a terrapin pen. This land for some years has been rented to tenants on a share crop basis, the tenants changing from time to time. As a result the property has been unprofitable and the income therefrom has not equalled the amount of taxes. In fact, 257 acres of this land has not been farmed for at least four or five years. There is no testimony before us to show that by adequate and modern farming operations appellants' land could not be as profitable as other lands in Talbot County. Like all other property bordering the Chesapeake Bay there has been some erosion along the waterfront. In February, 1953, about two months before the Zoning Ordinance was finally adopted, it became known that the Pan American Refining Corporation was considering locating an oil refinery in the Bay Hundred District which would take in the property of the appellants here. On May 20th or 23rd, 1953, after the enactment of the Zoning Ordinance, the Commissioners of the Town of St. Michaels in the Bay Hundred District and the Pan American Refining Corporation filed an application to rezone property, including that of the appellants, industrial rather than agricultural. In September, 1953, this application was withdrawn as Pan American had decided to locate in Virginia.

Appellants produced expert witnesses who testified that the property was the most suitable site for general modern industry on the Atlantic Seaboard between Sandy Hook and Cape Charles which had not already been occupied by industry or by the military services. The depth of the water and the nature of the shore line was such that it was economically practical to construct a large deep water port with sufficient depth to accommodate the largest ocean-going vessels. At the argu-

ment in this Court it was admitted that the water for a distance of approximately one-half mile from appellants' property is only three or four feet deep and that no better harbor now exists at this location than at any other exposed waterfront on the Chesapeake Bay. According to appellants' witnesses, in order to create a harbor it would be necessary to spend approximately five million dollars for dredging. This dredging would create from 1000 to 1375 acres of new land. To provide the necessary pier facilities would cost approximately fifteen million dollars. An oil refinery at this location would cost approximately fifty million dollars. It is shown by hydrographic charts that many other areas in this general locality could be made into deep water ports by the expenditure of practically the same amount of money as would be necessary here. In fact, some of the same facilities are available at Wade Point only a few miles distant from appellants' property.

Another expert witness, produced by the appellants, testified that water tests on their property showed a water supply beneath the surface, sufficient to produce twenty million gallons of water a day, which was adequate for a large oil refinery or other heavy industry, without probable effect on the water now used in that area. However, it was admitted that in order to produce this amount of water it would be necessary to put in ten wells which would require an area of from $6\frac{1}{2}$ to 7 miles, which is larger than appellants' property. However, this expert witness admitted that this same water supply ran all the way across the whole Eastern Shore of Maryland and out-cropped in the ocean beyond the Continental Shelf and that this water supply was not peculiar to appellants' property. Appellants also stress the fact that their property, with adequate waterfront, is near railroads and good highways. Maps offered in evidence show other locations in Talbot County with adequate water front near railroads and good highways. From the testimony and exhibits it could be reasonably found that appellants' property was no more

suitable for a deep water port than many other locations along the Chesapeake Bay with the expenditure of the same amount of money required here. Appellants stress the fact that they obtained a Necessity Certificate from the Office of Defense Mobilization on February 3, 1955. The only effect of this Certificate is the declaration by the Office of Defense Mobilization that the installation is essential in national defense, and that a five year tax write off would be granted by the Government. These certificates are intended to encourage people to disperse industry in order to aid the national defense. To encourage such dispersement the income tax advantage is given. It appears that the Certificate here was issued for a period of six months only. If construction is not started within that time or an explanation made why it has not been started, the Certificate will be cancelled.

Under the Zoning Ordinance, appellants' property is zoned for agriculture, home occupation, single family dwellings, guest houses, boarding houses and employee housing, among other things. The fact that appellants' property is less profitable, being used for agricultural or residential rather than industrial purposes, is not a sufficient basis for holding that the police power has been improperly exercised. Where the uses of property are detrimental to the public health, safety, morals or general welfare, such uses may be prohibited even though it will result in inconvenience or loss to individuals. These individual rights are subordinate to the higher rights of the public. *Byrne v. Maryland Realty Co.,* 129 Md. 202, 98 A. 547; *Carney v. City of Baltimore,* 201 Md. 130, 93 A. 2d 74. In the case of *Kracke v. Weinberg, supra,* strongly relied on by the appellants, it was stated that the value of the land for sale or lease was undoubtedly much less when it was restricted to residential uses and, although this is true of all property affected by residential zoning, too much weight could not be given to the fact that the value of the land is thereby decreased. It was said in *Easter v. City of Baltimore,* 195 Md. 395, 73 A. 2d 491: "The mere fact that the variance would

make the property more profitable is not a sufficient ground to justify a relaxation of setback requirements. *Garden View Homes v. Board of Adjustment,* 137 N. J. L. 44, 57 A. 2d 677." See also *Ellicott v. City of Baltimore,* 180 Md. 176, 23 A. 2d 649; *American Oil Company v. Miller,* 204 Md. 32, 42, 102 A. 2d 727; *Zahn v. Board of Public Works, supra.* In such cases as *N. W. Merchants Term. v. O'Rourke,* 191 Md. 171, 60 A. 2d 743; *Hoffman v. City of Baltimore,* 197 Md. 294, 79 A. 2d 367; *Kracke v. Weinberg, supra;* and *City of Baltimore v. Cohn, supra,* it was found that the property could not reasonably be used for the purposes for which it was zoned. An expert witness for appellants gave a very high estimate as to the value of appellants' land. In *Anne Arundel County v. Ward,* (1946), 186 Md. 330, 46 A. 2d 684, the denial of the right to erect certain types of houses in a residential area, contrary to the zoning regulations, was upheld. In *Anne Arundel County v. Snyder,* (1946), 186 Md. 342, 46 A. 2d 689, the denial of the right to build a show room and store room and the construction of a dock, forbidden by the zoning ordinance, was affirmed. In *Zang & Sons, Builders, Inc. v. Taylor,* (1954), 203 Md. 628, 102 A. 2d 723, the denial for the erection of an open air drive-in motion picture theatre in a "Cottage Residential" area was upheld. In *American Oil Company v. Miller,* (1954), *supra,* the erection of a gasoline filling station in an agricultural area on the Ritchie Highway, near Annapolis, was denied. In *Temmink v. Board of Zoning Appeals for Baltimore County,* (1954), 205 Md. 489, 109 A. 2d 85; *Zinn v. Board of Zoning Appeals of Baltimore County,* 207 Md. 355, 114 A. 2d 614; and *Schiff v. Board of Zoning Appeals of Baltimore County,* 207 Md. 365, 114 A. 2d 644, the erection of shopping centers in residential areas was denied.

There is testimony that many of the people in the Bay Hundred District are strenuously opposed to zoning and to the prohibition of industrial uses in that District. Exercise of the police power in zoning regulations cannot be governed "by a plebiscite of neighbors or for their

benefit." *Benner v. Tribbitt,* 190 Md. 6, 20, 57 A. 2d 346. Testimony was offered by the appellees which shows that Talbot County is essentially a rural area of about 20,000 people, approximately 10,000 of whom live in Easton, the County Seat. The remaining 10,000 live on farms or in small country towns and get their livelihood from the land or water. For perhaps three hundred years this County has grown slowly in population and is a very harmonious development. The economy has been balanced between light industry, agriculture and services for the agricultural population. Practically all of the population works directly or indirectly in the production of farm produce and products or in processing those products. Practically everybody seeking employment is employed. There is only about five percent of unemployment and no floating labor supply. This County has been practically immune to depression because the people live primarily off the land and in towns catering to the wants of the people on the farms.

Early in 1951, the bridge across the Chesapeake Bay being imminent, zoning was deemed advisable by many residents of Talbot County. Mr. Irving C. Root, a professional planner experienced in zoning, was employed. He has been engaged in planning work since 1918. From 1927 to 1940 he was chief engineer of the Maryland National Capital Park and Planning Commission and prepared a master plan for suburban Washington which consisted of three hundred square miles in Montgomery and Prince George's Counties. He was City Planning Consultant for the United States Department of Interior. He made exhaustive land use study and a field survey in Talbot County. He started work there in November, 1951, and continued practically continuously until January, 1954. He stated that the Zoning Ordinance finally adopted was based on a comprehensive plan. The question of industrial opportunities in Talbot County was studied and he testified that under the Zoning Ordinance fifty times more industrial area is provided in Talbot County than now exists as active industry, and that an

extremely large amount of commercial and industrial property has been added. Transportation facilities have been considered in zoning the industrial areas. He said: "Through many years industry has developed in certain places in Talbot County, and those places were considered as the logical place for more industrial expansion, and that's why the areas where the canneries are is enlarged so that they could have more canneries. The seafood packing places on the water-front were enlarged so they could have large expansion. Beyond that it would be merely visionary as to where you would put additional industrial zones." He further said that ample provision had been made for enormous industrial expansion.

Numerous public meetings were held throughout the County to discuss the Zoning Ordinance. That Ordinance adopted by the Commissioners reflected not only competent professional study, but consideration over a long period of time by the Commission and the general public. The Ordinance, as adopted, was consistent with the fundamental framework of the County's economic and social life and such as to promote the health, safety and general welfare of its citizens. It is settled law that where a legislative body, using properly the powers given it by the Legislature, has adopted a zoning ordinance, its exercise of the police power is presumed to be valid. A successful attack upon such an ordinance must show affirmatively and clearly that it is arbitrary, capricious, discriminatory or illegal, so that necessarily a review by a court is narrow in scope. *Anne Arundel County v. Ward, supra.* We cannot find grounds here for successful attack upon the Ordinance as a whole.

To appellants' earnest contention that even though the Ordinance be held validly adopted, and to be generally applicable and effective, nevertheless, as applied to their property, it is so arbitrary and unreasonable as to be unconstitutional, we find the answer to be that the restrictions of the Ordinance do not deprive the appellants of many uses for which their property is reasonably adapted, and that, therefore, they have no just claim

for relief. The testimony shows that the appellants' property does not differ from other farm land in the vicinity. An experienced real estate man testified for the appellees that he had known the property for many years and that it was "a lovely place to live." He added that if appellants' land were zoned industrial and no industry was established, other property in the neighborhood would be depreciated. He, undoubtedly, had in mind the well-known fact that many of the Talbot County farms have been bought for and used as country estates. He admitted on cross-examination that it was possible that an industrial market might open up which would make the land of greater value. The fact that by the expenditure of many millions of dollars, appellants' land could be made attractive to commercial users, does not amount to a valid showing that the zoning restrictions are arbitrary and unreasonable as applied to land which under such restrictions may be used for many purposes for which it is adapted, such as farming, subdivision, a country estate, a guest house or a boarding house. In *Baltimore City v. Cohn, supra,* where there was a finding of arbitrary and unreasonable zoning, as applied to a particular lot, the controlling principles were succinctly set forth as follows: "It is recognized that although a zoning ordinance is not invalid *per se,* yet when the provisions of such an ordinance come to be applied to particular premises, it may be found to be clearly arbitrary and unreasonable. A particular provision or application of a zoning ordinance may be held invalid where it restricts property to uses for which the property is not adapted. A zoning restriction may be regarded as arbitrary and unreasonable as to a property owner who is unable to use his property for any of the permitted purposes and is therefore deprived of all beneficial use thereof.

"Thus we reaffirm the doctrine that a zoning ordinance which permanently so restricts the use of property that it cannot be used for any reasonable purpose goes beyond permissible regulation, and must be regarded as a

taking of property without compensation. *Northwest Merchants Terminal, Inc. v. O'Rourke,* 191 Md. 171, 60 A. 2d 743; *Hoffman v. Mayor and City Council of Baltimore,* 197 Md. 294, 79 A. 2d 367; *Arverne Bay Construction Co. v. Thatcher,* 278 N. Y. 222, 15 N. E. 2d 587, 117 A. L. R. 1110. To sustain an attack upon the validity of the ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions upon his property preclude its use for any purpose to which it is reasonably adapted, * * *." Applying this yardstick, as we must, to appellants' property their case falls. The decree will be affirmed.

*Decree affirmed, with costs.*