GRANT ᴇᴛ ᴀʟ. *v.* MAYOR AND CITY COUNCIL OF
BALTIMORE ᴇᴛ ᴀʟ.

[No. 102, October Term, 1956.]

302

*Decided February 14, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Wilson K. Barnes* and *Frank B. Ober,* with whom were *William A. Grimes* and *C. Morton Goldstein* on the brief, for the appellants.

*Walter C. Mylander, Jr.,* and *Charles C. W. Atwater,* with whom were *Thomas N. Biddison, City Solicitor of Baltimore,* and *Shirley Brannock Jones, Assistant City Solicitor,* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

From the beginning of zoning in Baltimore billboards were excluded prospectively from residential districts, although those already there were permitted to remain as nonconforming uses. Then in 1950 the City Council passed Ordinance 1101, approved April 5 of that year, requiring all outdoor advertising structures in residential districts to be removed not later than five years from the passage of the ordinance. In 1953 after full hearings and extended consideration, there was passed Ordinance 711 generally revising the zoning laws of the City. Paragraph 13(d) narrowed the exclusion of the 1950 ordinance, providing only that "Billboards and poster boards situated in Residential and Office Use Districts and Residential Use Districts shall be removed by April 5, 1955 * * *" that is, within five years of the passage of the 1950 ordinance.

The corporate appellants, signboard companies, and the individual appellants, owners of property leased for the use of billboards, ask us to reverse the chancellor who dismissed their bill that sought to declare the 1953 ordinance invalid and unconstitutional and to restrain the Mayor and City Council and the Building Inspection Engineer of Baltimore from enforcing it.

The Morton Company, Inc., or its corporate predecessors, had for many years been in the outdoor advertising business. In 1955 it had about sixteen hundred billboards in Baltimore and its environs, some nine hundred being within the city limits. Seventy-eight are in residential or residential and office use districts, all being nonconforming uses that have endured since the passage of the first zoning ordinance in 1931. Fourteen of these are illuminated. All of the thirty-eight leases for the nonconforming billboards were entered into after 1950. Most are for terms of one year; none, except one executed in 1952, has a term of over five years. Morton received about $45,000 a year gross from advertisers on the seventy-eight billboards. Its testimony was that billboard coverage is sold in "packages" of from fifteen to sixty boards for frequent repetition on main roads and so as to provide a network of coverage which is "almost inescapable" to a "captive audience". Removal of the nonconforming billboards would seriously diminish the adequacy of coverage and injure the business. After the filing of the bill, Donnelly Advertising Corporation of Maryland acquired the assets of Morton and was allowed to intervene in the case, as were several individual appellees who owned homes near billboards.

The individual appellants, Mr. and Mrs. Grant, and Samuel Cooper, each own a parcel of land in a residential district which has been leased for billboard use continuously since before the original Baltimore zoning ordinance of 1931. The Grant lease was for one year beginning November 1, 1953. There have been two one year extensions as the lease allowed. The rent is $200.00 a year. The Cooper lease was for one year beginning April 1, 1954, and there has been one extension for another year. The Grants bought their unimproved lot on the east side of Greenspring Avenue near Gordon Road in 1923. It has been leased for billboards since 1927. Cooper bought his lot, on which there is a house he rents out, in 1953, and he continued the leasing of part of the property for billboard use begun before 1931 by his predecessors in title. His rent is $35.00 a year.

The appellants urge that their rights to nonconforming uses

are vested rights of property which the enforcement of paragraph 13(d) of Ordinance 711 of 1953 would take from them without compensation, contrary to Art. 3, Sec. 40 of the Constitution of Maryland, and so would deprive them of property without due process of law, as well as be discriminatory and a denial of the equal protection of the laws.

Nonconforming uses have been a problem since the inception of zoning. Originally they were not regarded as serious handicaps to its effective operation; it was felt they would be few and likely to be eliminated by the passage of time and restrictions on their expansion. For these reasons and because it was thought that to require immediate cessation would be harsh and unreasonable, a deprivation of rights in property out of proportion to the public benefits to be obtained and, so, unconstitutional, and finally a red flag to property owners at a time when strong opposition might have jeopardized the chance of any zoning, most, if not all, zoning ordinances provided that lawful uses existing on the effective date of the law could continue although such uses could not thereafter be begun. Nevertheless, the earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned, and the ordinances forbid or limit expansion of nonconforming uses and forfeit the right to them upon abandonment of the use or the destruction of the improvements housing the use. *Colati v. Jirout,* 186 Md. 652; *Beyer v. City of Baltimore,* 182 Md. 444. In *Dorman v. Mayor and C. C. of Baltimore,* 187 Md. 678, 684, the issue was whether a nonconforming use had been abandoned. Judge Markell said for the Court, in speaking of the aim of bringing about general conformity: "The right under Paragraph 11 to 'continue' a non-conforming use is not a perpetual easement to make a use of one's property detrimental to his neighbors and forbidden to them."

Nonconforming uses have not disappeared as hoped and anticipated because the general regulation of future uses and changes, with some existing uses uncontrolled, have put the latter in an intrenched position often with a value that is great—and grows—because of the artificial monopoly given

it by the law. Indeed, there is general agreement that the fundamental problem facing zoning is the inability to eliminate the nonconforming use. *City of Los Angeles v. Gage* (Dist. Ct. App., 2nd Dist., Cal.), 274 P. 2d 34, 40.

The Courts confirmed the expectations of those who began zoning. It soon was and still generally is held that it is unreasonable and unconstitutional for a zoning law to require immediate cessation of nonconforming uses otherwise lawful. *Anne Arundel County v. Snyder,* 186 Md. 342, 346; *Amereihn v. Kotras,* 194 Md. 591, 601, and cases cited; *Jones v. City of Los Angeles* (Cal.), 295 P. 14; *Standard Oil Co. v. City of Bowling Green* (Ky.), 50 S. W. 2d 960; *Des Jardin v. Town of Greenfield* (Wis.), 53 N. W. 2d 784.

The frustrations of the people as they were faced with nonconforming uses soon found their representatives in the lawmaking bodies trying other ways to get rid of them. Two tools resorted to were eminent domain and the law of nuisances. The effectiveness of eminent domain is restricted by the necessity that the purchase must be for public use, by the complexities of administrative procedures and by the high cost of reimbursing the property owners. The law of nuisances has limits that many times make its use fall short of the objective. Some courts will restrain only common law nuisances and even where the lawmakers have expanded the nuisance category, judicial enforcement seems often to have been restricted to uses that cause a material and tangible interference with the property or personal well-being of others, uses that are equivalent to or are likely to become common law traditional nuisances.

It has become apparent that if nonconforming uses are to be dealt with effectively it must be under the law of zoning, a law not limited in its controls to harmful and noxious uses in the common law sense. Many legislative bodies have come to the technique of statutes or ordinances that call for the cessation of the extraneous use after a tolerance or amortization period, varying in length with the nature of the use and of the structures devoted to the use, from one year to sixty years. Some of the jurisdictions that have enacted

such provisions are cited below.[1] It has been said that the only positive method yet devised of eliminating nonconforming uses is to determine the normal useful remaining economic life of the structure devoted to the use and prohibit the owner from using it for the offending use after the expiration of that time. *Crolly and Norton, Termination of Nonconforming Uses,* 62 Zoning Bulletin 1, June 1952, cited in *City of Los Angeles v. Gage,* 274 P. 2d 34, 41, *supra.*

Some Courts have refused to distinguish between laws requiring immediate cessation of nonconforming uses and those that demand cessation only after the expiration of a tolerance or amortization period, holding that the latter as well as the former are unconstitutional.[2]

---

1. Colo. Stat. Ann. (Supp. 1953) c. 45A, § 19 (county zoning); Ill. Rev. Stat. (1953) c. 24, § 73-1 (city zoning); Kan. Gen. Stat. Ann. (1949) § 19-2919 (county zoning); Mass. Acts 1948, c. 214, § 9; Okla. Stat. Ann. (Supp. 1954) tit. 19, c. 19, § 863.16 (county zoning); Pa. Stat. Ann. (Purdon, Supp. 1954) tit. 16, § 16-2033 (county zoning); Utah Code Ann. (1943) § 19-24-18 (county zoning); Va. Code (1950) § 15-843 (city zoning); Chicago Zoning Ord., § 20 (1944); Cleveland, Ohio, Ord. § 1281-9(e) (1930); Bridgeport, Conn.; Los Angeles Mun. Code, § 12.123 B & C (1946); New Orleans, La., Zoning Ord.; Richmond, Va., Zoning Ord., Art. XIII, § 1 (1948); Seattle, Wash. (see *State ex rel. Miller v. Cain,* 40 Wash. 2d 216, 242 P. 2d 505, 507; Wichita, Kan., Zoning Ord., § 24 (1948)).

2. Cases so holding include: *James v. City of Greenville* (S. C.), 88 S. E. 2d 661; *Town of Greenburgh v. General Outdoor Adv. Co.,* 109 N. Y. S. 2d 826; *Town of Somers v. Camarco* (N. Y.), 127 N. E. 2d 327; *City of Akron v. Chapman* (Ohio), 116 N. E. 2d 697; *City of Corpus Christi v. Allen* (Tex.), 254 S. W. 2d 759, 761. The South Carolina and New York cases do not discuss in any detail the possible distinctions between immediate cessation and termination after a period of amortization. The Ohio case is criticized in 67 Harvard Law Review 1283, as being inconsistent "with the general acceptance of amortization principles". The Ohio statute had the weakness of leaving the time for stopping the nonconforming use with the city council and thus, perhaps, was unduly harsh in not providing a definite tolerance period. Too, the decision of the council as to the choice of the use to be stopped and the time for the stopping could well have been actually discriminatory. In the *Corpus Christi* case the Supreme Court of Texas refused to end

Other Courts have held that nonconforming uses could be stopped after specified periods of time. In *State v. Mc-Donald*, 121 So. 613, *certiorari* denied, 280 U. S. 556, 74 L. Ed. 612, the highest Court of Louisiana held that any business operated in violation or defiance of a zoning ordinance was to be regarded as a public nuisance and that an existing grocery store in a residential use district could be forced by a zoning ordinance to close after the one year grace period. There was a similar holding as to a drug store in *State v. Jacoby* (La.), 123 So. 314. The Court held that the one year amortization period was not unreasonable in light of the size of the business and the feasibility of moving it within the allotted time. In *Standard Oil Co. v. City of Tallahassee*, 183 F. 2d 410, *certiorari* denied, 340 U. S. 892, 95 L. Ed. 647, affirming the District Court whose opinion is reported in 87 F. Supp. 145, the United States Court of Appeals for the Fifth Circuit upheld an ordinance requiring the discontinuance of a filling station in Tallahassee, Florida, near the State Capitol. A ten year tolerance period had been established by ordinance for residential zones and then, a later ordinance had changed the district in question to residential, effective at the end of the ten year period. The net effect of the two ordinances was to make the existing use unlawful after ten years. The opinions in the Louisiana cases and in the Fifth Circuit case are not particularly persuasive in their reasoning (that of the District Court in the latter case is more satisfying). We are impressed, however, with the soundness of two California decisions. In *Livingston Rock & Gravel Co. v. County of Los Angeles* (Cal.), 1954, 272 P. 2d 4, a cement mixing company was established in a zone

---

a nonconforming use under a two year amortization provision, finding the power attempted to be used would be unreasonable because any benefit to the city by its exercise would be small and the damage to the property owner would be heavy. The Court concluded its opinion, however, as follows: "Our conclusion is not to be construed as a holding that the ordinance in question may not, under other circumstances, be invoked to terminate a non-conforming use, not a nuisance nor injurious to the public health, morals, safety or welfare."

of unlimited uses. A rezoning ordinance put the property in a light manufacturing zone. The ordinance allowed existing uses to continue for a maximum of twenty years with provisions for revocation of the right if the zoning administrative board should find that either (a) the condition of structures devoted to the use was such that their employment only in uses currently permitted in the district would not impair the constitutional rights of any persons, or (b) that the nature of the improvements were such that they could be altered so as to be used in conformity with permitted uses without impairing any constitutional rights. After a hearing, the board revoked the company's right to operate the plant, effective one year later. The Supreme Court of California said that manifestly care had been taken in the rezoning regulations to refrain from interference with constitutional guaranties and that it would be a contradiction in terms to hold the regulations unconstitutional. The Court said: "* * * zoning legislation looks to the future in regulating district development and the eventual liquidation of nonconforming uses within a prescribed period commensurate with the investment involved. * * * The mere fact that some hardship may thereby be experienced is not controlling, for 'Every exercise of the police power is apt to affect adversely the property interest of somebody.' * * * Implicit in the theory of the police power, as differentiated from the power of eminent domain, is the principle that incidental injury to an individual will not prevent its operation, once it is shown to be exercised for proper purposes of public health, safety, morals, and general welfare, and there is no arbitrary and unreasonable application in the particular case." The holding was that an existing lawful business could be closed in the legitimate exercise of the police power, if found to be detrimental to the public health, safety or welfare, and that administrative remedies must be used—and not injunction—to test the validity of the closing in the particular case.

In *City of Los Angeles v. Gage,* to which we have referred, the ordinance before the Court provided for the gradual elimination from residential areas of all commercial and industrial uses, including billboards, within named periods of

time that varied according to the nature of the structure or use. Gage owned a two family residence building in a residential area before the passage of the ordinance. The upper part was used as a residence and the lower part as a wholesale and retail plumbing supply business, a permitted use when the property was bought but one that the new ordinance required to be eliminated within five years. The business produced a gross revenue of between $125,000 and $350,000 a year. The lower court found that the business could not be removed at the end of five years, or thereafter, without substantial loss and expense, and held the ordinance void as to Gage. The intermediate appellate court reversed, holding the ordinance valid. It said: "The distinction between an ordinance restricting future uses and one requiring the termination of present uses within a reasonable period of time is merely one of degree, and constitutionality depends on the relative importance to be given to the public gain and to the private loss. Zoning as it affects every piece of property is to some extent retroactive in that it applies to property already owned at the time of the effective date of the ordinance. The elimination of existing uses within a reasonable time does not amount to a taking of property nor does it necessarily restrict the use of property so that it cannot be used for any reasonable purpose. Use of a reasonable amortization scheme provides an equitable means of reconciliation of the conflicting interests in satisfaction of due process requirements." See also *Franklin Furniture Company v. City of Bridgeport* (Conn.), 1955, 115 A. 2d 435, where the Court upheld an ordinance of the City of Bridgeport forbidding the erection or maintenance of any advertising or name sign or advertising device of any character that extended or projected over any part of the sidewalk. The Court said: "The police power is not confined narrowly within the field of public health, safety and morals. It is within the police power to regulate occupations or businesses which, owing to their nature or the manner in which they are conducted, may be detrimental to the general welfare."

The Supreme Court has gone far in upholding local exer-

cise of the police power, as *Hadacheck v. Sebastian,* 239 U. S. 394, 60 L. Ed. 348, reveals. Hadacheck owned and operated a brickyard near Los Angeles. The clay deposits were worth $800,000 for bricks, and no more than $60,000 for residential or other use. The operation was entirely lawful until Los Angeles annexed the area in which the brickyard stood and passed an ordinance forbidding the establishment or operation of brick-making in that area. It was found to be clear that the ordinance was an honest and non-discriminatory exercise of the police power. Even though the brickyard could not be moved or the clay used elsewhere, the Supreme Court found that there was no taking of property without due process of law. Relied on was *Reinman v. Little Rock,* 237 U. S. 171, 59 L. Ed. 900, in which the Court had approved the City of Little Rock's ban on a livery stable in a residential neighborhood. The *Hadacheck* opinion said that the police power cannot be arbitrarily exercised and added: "The principle is familiar, but in any given case it must plainly appear to apply. * * * we are dealing with one of the most essential powers of government,—one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. * * * There must be progress, and if in its march private interests are in the way, they must yield to the good of the community." Both in the *Hadacheck* and *Reinman* cases, the Court viewed the prohibited uses as lawful in themselves but of a kind that could be regulated— even to the point of being barred from certain neighborhoods. In both cases there was evidence of unpleasant odors and unsanitary conditions. In *Hadacheck*, sickness and discomfort were charged to fumes, gas, soot, steam and dust. It was found that the occupants of nearby residences were "seriously incommoded". Although the Court did not decide the cases on that basis, in their impact on the law of zoning, they often have been measured as nuisance cases. Even so regarded, they have pertinence here. In *Euclid v.*

*Ambler Realty Co.,* 272 U. S. 365, 71 L. Ed. 303, the foundation case in zoning law, the Supreme Court said that zoning ordinances "* * * must find their justification in some aspect of the police power, asserted for the public welfare." It went on to say that "The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. * * * And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining the scope of, the power." It went on to say that a "* * * nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard."

On this point, see *Jack Lewis, Inc. v. Baltimore,* 164 Md. 146, 153, where Judge Offutt, for the Court, discusses why a funeral home should not be allowed in a residential area, and justifies the ban largely on the affront to the sensibilities of the neighbors. Judge Offutt pointed out that there has been in the zoning of cities "a constant struggle between 'precedent and progress,' * * * between the rights of property and the rights of men." It was held that the exercise of the police power in zoning, the protection of the "public safety and welfare" need not stop with protection against disease, fire, traffic or lawlessness, but that it may properly extend "to the maintenance of conditions under which people may live and work in reasonable comfort, and without unnecessary impairment of their physical and mental vigor."

Every zoning ordinance impairs some vested rights because it affects property owned at its effective date. In *Euclid v. Ambler Realty Co., supra,* the land of the realty company was in the immediate path of currently expanding commercial and industrial uses and worth $10,000 an acre for those purposes. The ordinance restricted its use to residential and for this it was worth but $2,500 per acre. The Supreme Court found no trouble in holding that the restriction was not a taking of property without due process. In *Walker v. Talbot County,* 208 Md. 72, 87, *certiorari* denied, 350 U. S. 902, 100 L. Ed. 792, the landowners restricted to residential or farm use by the new zoning ordinance

claimed their land was worth millions for use as a tidewater port. We said: "However, all uses of property which are injurious to the health, comfort, safety and welfare of society may be prohibited under the sovereign power of the state, even though the exercise of such power results in inconvenience or loss to certain persons. In those cases, individual rights are subordinate to the higher rights of the public."

The distinction between an ordinance that restricts future uses and one that requires existing uses to stop after a reasonable time, is not a difference in kind but one of degree and, in each case, constitutionality depends on overall reasonableness, on the importance of the public gain in relation to the private loss. New York applies the rule of reasonableness to legislative efforts to end nonconforming uses—quite strictly—as *People v. Miller,* 106 N. E. 2d 34, shows. The Court said: "The decisions are sometimes put on the ground that the owner has secured a 'vested right' in the particular use—which is but another way of saying that the property interest affected by the particular ordinance is too substantial to justify its deprivation in light of the objectives to be achieved by enforcement of the provision. (Cf. Note, 41 Harv. L. Rev. 667; Note, 39 Yale L. J. 735, 740.) Every zoning regulation, because it affects property already owned by individuals at the time of its enactment, effects some curtailment of 'vested' rights, either by restricting prospective uses or by prohibiting the continuation of existing uses. A regulation of the latter variety, however, almost always imposes substantial loss and hardship upon the individual property owner—a loss much greater than that sustained by reason of a prospective use restriction only— and that factor underlies the rule that we are discussing."

There is no difference in kind, either, between limitations that prevent the adding to or extension of a nonconforming use, or provisions that the right to the use is lost if abandoned or if the structure devoted to the use is destroyed, or the denial of a right to substitute a new use for the old, all of which are common if not universal in zoning laws and all of which are established as constitutional and valid, on the

one hand, and a requirement, on the other, that an existing nonconformance must cease after a reasonable time. The significance and effect of difference in degree in any given case depends on circumstances, environment and length of the period allowed for amortization.

We think that in requiring billboards to leave residential areas after a tolerance period of five years, the City Council has not overstepped the line that divides the reasonable and constitutional from the arbitrary and invalid. Billboards are not nuisances *per se*—indeed, Ordinance 711 provides, as did predecessor ordinances, that a billboard may be erected in commercial and industrial zones as a matter of right, unless it is determined as a fact that it "* * * would menace the public health, safety, security or morals". *Maryland Advertising Co. v. City of Baltimore,* 199 Md. 214; *Gilmor v. Mayor and City Council,* 205 Md. 557. This is not decisive. Billboards have been banned in Baltimore from residential areas from the start of zoning, and the appropriateness and legality of the ban now is accepted without challenge, as we think it must be. It does not follow that because billboards are not *prima facie* objectionable in commercial and industrial districts—although there they may be found as a fact to be objectionable—that the people acting through their legislative representatives, may not find and declare them to so seriously incommode the health, comfort and general welfare of the dwellers in residential zones that the benefit to the public, brought about by their removal, substantially outweighs the resulting harm to individuals. If it does not clearly appear that this legislative finding was unreasonable and arbitrary— almost demonstrably wrong from the record—the courts may not disturb it.

In considering this question, we pay heed to the rule that a legislative determination of facts and conditions calling for the passage of a law, either spelled out or implicit in the legislation, is entitled to very great although, of course, not conclusive weight. The preamble to Ordinance 1101 of 1950, the first ordinance to require elimination of the offending signs, announced the legislative finding that residential neighborhoods "are now blighted, or threatened with blight, by

billboards, both illuminated and non-illuminated;" that "* * * always depreciate the value of residential property and are a menace to home atmosphere and home surroundings". The legislative exercise of the police power is presumed to be valid and a successful attack upon it "* * * must show affirmatively and clearly that it is arbitrary, capricious, discriminatory or illegal, so that necessarily a review by a court is narrow in scope." *Walker v. Talbot County*, 208 Md. 72, 93, *supra*.

We find nothing in the record to rebut the presumptive validity of the legislative findings and of the resulting ordinances of 1950 and 1953. The record supports the Council on these matters and in its treatment of billboards, in 1953, as a separate category or classification. It was shown that no ordinance in recent memory has aroused more public interest or received more public attention than Ordinance 711 of 1953. Only after extended hearings and full consideration of the views of both proponents and opponents was it enacted. Over forty civic and improvement associations endorsed it. The Council had the benefit of the views of C. William Brooks, for many years zoning enforcement officer of Baltimore, and more recently consultant to the Planning Commission of the City, and of a report of the Planning Commission which, in turn, had been advised by Flavel Shertleff. Dr. Shertleff was long assistant director of the Regional Plan of New York (supported by the Russell Sage Foundation) and Executive Director of the Conference on Planning in the United States, as well as associate professor of Planning and Zoning, Legislation and Administration of the Massachusetts Institute of Technology, and a nationally known expert on zoning who had been retained by a number of municipalities to advise them on the subject. The Report of the Planning Commission, an exhibit in the case, contains this language: "The one thing, however, upon which all the experts agreed was our immediate needs for adequate provisions to eliminate non-conforming uses". The report noted that expert opinion considered that a high frequency of nonconforming uses contributed to blighted areas and slums and said: "Areas taken for public

housing and redevelopment in Baltimore City show a high frequency of non-conforming uses, some as high as 13 percent."

Mr. Brooks testified as to numerous complaints as to billboards that he had received and verified. They included fires near the signs, the deposit of bottles around them, the commission of nuisances and the attraction of bugs and insects to the illuminated boards so that it was impossible after dark to sit on the porches of residences nearby. Mr. Brooks' opinion was that the general complaints as to billboards depreciating the value of properties in residential zones were fully justified. To him the presence of signboards in a residential district is evidence of "downhill" blight of the neighborhood.

Dr. Shertleff testified that billboards have a depreciating effect on residential neighborhoods. The constant, unrelieved salutations of the signs irritate the inhabitants. People move away because of this irritation and those who live elsewhere are deterred from moving in. Billboards in a neighborhood make it an unpleasant place in which to live. He said that billboards in residential districts hurt the general welfare because a community's well-being is related to the general welfare and billboards depress the community's sense of well-being.

Lay witnesses—those who lived near signboards—confirmed the experts on the constantly irritating effect of the inescapable salutations of the advertising. One witness said of the boards: "* * * the things literally scream at you * * *."

Many of the unsanitary and unsafe conditions brought about by billboards, revealed by the testimony, could be cured by legislation requiring the signs to be fireproof and at least six feet above the ground, as the ordinances have long made prerequisites for the erection of such signs in commercial and industrial zones. This would not cure the obnoxious effect in residential areas of the illuminated signs or the serious incommoding of the comfort and welfare caused by the boards or their contribution to the depreciation of property values and the bringing about of blight in residential districts.

The conclusions of the experts, the citizens and the City Council that billboards depreciate residential property and harm residential neighborhoods is not new. In *General Outdoor Advertising Co. v. Department of Public Works* (Mass.), 1935, 193 N. E. 799, 811, Chief Justice Rugg pointed out for the Court that the master who had heard extensive testimony and personally made exhaustive investigations, had found "that signs and billboards when erected or maintained in districts of an indisputably business character have no depreciating effect upon property values. In a neighborhood of homes, such commercial intrusions are offensive to the sight and obnoxious to ordinary, reasonable persons who may own or occupy those homes. Because of the serious aversion to such signs and billboards, they substantially and materially annoy and disturb the occupants and interfere with the comfortable enjoyment of their homes. The introduction of signs and billboards into such a neighborhood tends seriously to injure and depreciate the value of the property." The Court then said that all such findings had been considered by the Court before it held that billboards could be regulated or prohibited prospectively in certain areas.

Having determined the harm to the public welfare, the Council undoubtedly concluded that an equitable means of reconciling the conflicting interest of the public on the one hand, and those of advertising companies and those leasing land to them on the other, and thus the satisfaction of the requirements of due process, would be a five-year amortization period. We cannot say that the remedy chosen was arbitrary, nor that the City Council was wrong in its conclusion that the effect for good on the community by the elimination of billboards within five years would far more than balance individual losses. Certainly that is the unanimous view of those expert in the field and of the forty civic and improvement associations which studied the problem and endorsed the ordinance. As we have noted, and as the report of the Planning Commission pointed out to the City Council, a number of States and municipalities have provisions requiring elimination of nonconforming uses in residential dis-

tricts within stated periods of time, varying with the nature of the structures involved. That many lawmaking bodies throughout the country have adopted the same approach does not make the approach valid, but certainly the fact that after full consideration, they have followed the same course to meet the same problem, is some indication of the reasonableness of the course. Too, some support for the validity of the amortization method of eliminating nonconforming uses is found in the law reviews. Almost unanimously they commend the method as the best available and find it valid and constitutional.[3]

The accountant for the Morton Company, who prepared their income tax returns, testified that the internal revenue service depreciation schedules do not include outdoor advertising boards because there are not enough of them to justify it, but that the Internal Revenue Code provides that any depreciation rate used by the taxpayer must cover the useful life of the thing being depreciated, and that at the direction of Morton's officers he regularly used, for income tax purposes, a depreciation period of five years for all signboards regardless of the material of which they were made. A corporation that has regularly, year by year, acted in its financial affairs, under the oath of its authorized officers (and penalty of perjury), on the premise that the full useful life of its billboards is five years is handicapped seriously in arguing persuasively that legislative reliance on that same premise has done it a constitutional wrong—has taken from it substantial property without compensation—by banning the further use of those billboards. All of the seventy-eight billboards in question are on leased land. None of the leases, except one executed two years after the 1950 ordinance has a term of as much as five years. Most of the leases are for terms of one year, with options to renew. None were in effect before April 5, 1950, although similar leases for the same

---

3. 67 Harvard Law Review 1283; 53 Michigan Law Review 762; 35 Virginia Law Review 348; 102 Univ. of Pa. Law Review 91; 41 Columbia Law Review 457; 33 Dicta 93. See also annotation in 42 A. L. R. 2d 1146.

locations had been in effect before then. The leases all provide that the advertising company may terminate them if the law forbids the maintenance of the boards. Not only did Morton enter into the current leases knowing that the ordinance required removal of the signs by April 5, 1955, but it protected itself and its successors from paying rent if the ordinance successfully withstood attack in the courts. The signs in residential districts constitute but five per cent of all the company's signs in the Baltimore area. They are so constructed that if—as is probably true—they have some further useful life after five years they can be moved to locations in commercial and industrial zones and there earn revenue for their owner.

The positions of the individual appellants, the Grants and Cooper, are not identical with those of the corporate appellant. We think, however, that any loss or harm that they suffer as a result of Ordinance 711 is not sufficiently substantial compared to the public good to make the ordinance invalid as to them. If the ordinance imposed such restrictions that the land could not be used for any reasonable purpose, it would, of course, be invalid as to it. *City of Baltimore v. Cohn,* 204 Md. 523, 533. However, the record does not show this to be the case. Cooper bought his property in 1953 several years after Ordinance 1101 had been passed. The main value of the property is in a house on it which he rents out. The use of the property for the billboard is incidental and the yearly rental is small. The Grants bought their lot in 1923, four years before they began to lease it for the use of billboards. Soon after it was first bought, Grant began to fill in the gully in the rear of it, evidently with the idea of making it available for some use other than its present use. It was not shown that the Grants' lot could not be used for residential purposes. Mr. Grant testified that the gully running through his property was a barrier to residential use and his own opinion was that the lot was good for nothing except to support billboards. He admitted to the court, however, that residential construction was taking place on lots near his after the same gully had been filled. The leases on both properties are only for a one year term. Each owner

has had the right to the revenue brought by the billboards for the five years from 1950, and that length of time to make arrangements for, and bring about, other than billboard use. That the properties will be less valuable and the owners will suffer a loss in revenue because of the ordinance is not of itself controlling, as we have seen. We think Ordinance 711 is not unreasonable or invalid in its impact on either the Grants or Cooper.

No decision of this Court compels a conclusion different from that we have reached. In *Amereihn v. Kotras,* 194 Md. 591, *supra,* the Baltimore County ordinance expressly permitted nonconforming uses to continue, and to expand somewhat. There the holding was that the chancellor was wrong in granting an injunction against the erection of an addition to the factory that had been on the property before the ordinance. Such an addition was permitted under the terms of the ordinance. It was said that a nonconforming use was a vested right, and entitled to constitutional protection. It would seem that the case could have been decided on the basis of the ordinance. In *Higgins v. City of Baltimore,* 206 Md. 89, the aspect of the ordinance that dealt with the use of garages in residential areas was before the Court. We refused to hold that the ordinance operated retroactively lest it be unconstitutional under the holding of *Amereihn v. Kotras, supra,* and held that there had been such a use of the garages there involved before the effective date of the ordinance that the very language of the ordinance, as we read it, permitted continuance of that use. In *Laque v. State,* 207 Md. 242, the Court recognized that the right to a nonconforming use is entitled to protection, but held that since the user had failed to prove nonconformance at the effective date of the ordinance as its procedures required—and had lost his appeal to a court—he could not relitigate his claim years later.

The appellants argue that the zoning enabling act—Chap. 705 of the Acts of 1927—found in Code, 1951, Art. 66B, Secs. 1-9, shows by its provisions that it is entirely prospective in operation and, therefore, there was no legal foundation for the passage of Ordinances 1101 and 711 by

the City Council. The provisions of Sections 1-9 of Art. 66B seem to have been either those of, or to have closely followed, the provisions of the standard state zoning enabling act drafted in 1926 by an advisory committee to the Department of Commerce appointed by Secretary Herbert Hoover. *Heath v. M. & C. C. of Baltimore,* 187 Md. 296, 302. It is said in *"Elimination of Nonconforming Uses",* 35 Virginia L. R. 348, that: "The Standard Act made no attempt to protect nonconforming uses, a calculated omission rather than an oversight." [4] We think there is no merit to the suggestion that the City Council lacked the basic authority to pass Ordinances 1101 and 711.

There would seem to be a clear basis for classifying billboards separate and apart from other signs and other advertising. The report of the Planning Commission to the City Council put billboards in a separate category for several reasons and recommended the continuance of other signs and other forms of advertising, because they were felt to be truly accessory to the buildings or other nonconforming uses which would be permitted to continue, and the Council agreed. Billboards are not accessory uses. There is no need to refer again to their many objectionable features. Many Courts have said that classification of billboards for purposes of regulation and prohibition is valid and constitutional. See *Thomas Cusack Co. v. Chicago,* 242 U. S. 526, 61 L. Ed. 472; *Packer Corporation v. Utah,* 285 U. S. 105, 76 L. Ed. 643; *St. Louis Poster Advertising Co. v. St. Louis,* 249 U. S. 269, 63 L. Ed. 599; *Kelbro, Inc. v. Myrick* (Vt.), 30 A. 2d 527; *General Outdoor Advertising Co. v. Department of Public Works* (Mass.), 193 N. E. 799, *supra.* See also *Murphy v. Town of Westport* (Conn.), 40 A. 2d 177. The

---

4. According to the article in the Virginia Law Review, the draft of the original act prepared by the Department of Commerce in 1926 says on page 2 of the explanatory notes: "* * * it is recognized that there may arise local conditions of a peculiar character that make it necessary and desirable to deal with some isolated case by means of a retroactive provision affecting that case only. For this reason it does not seem wise to debar the local legislative body from dealing with such a situation."

324

validity of the classification would seem to destroy the argument of the appellants that the ordinances are discriminatory as to them.

There were many objections to the admissibility of evidence. Our consideration of the case has led us to the conclusion that if there were errors, they were not prejudicial in that the result reached by the chancellor, of which we approve, should have been reached whether or not the evidence objected to had been in the case. The decree will be affirmed.

*Decree affirmed, with costs.*