Van Voobhis, J.
(dissenting). The decision which is about to be rendered marks, in my view, the beginning of the end of the constitutional protection of property rights in this State in pre-existing nonconforming uses under zoning ordinances. Special Term and the Appellate Division unanimously fol- . lowed the existing law in holding this amendment to the zoning ordinance of the City of Buffalo to be unconstitutional. In my ^iew the traditional rule is right, and should not be abrogated.
Petitioners-respondents in 1924 began what has been described as a wholesale junk yard business at 35 Cumberland Avenue, in that city. Their principal line has been cooperage, although the city recognizes no distinction between that and the junk business. The opposite side of the street, at that time, was a rubbish dump being filled in by the city. Later residences commenced to be built in the area, after the fill had settled across the street, and the residential newcomers did not like the continuance of petitioners’ business in their new neighborhood. Although petitioners’ business has been conducted legally in every respect, the City of Buffalo refused to renew their license for 1956, although licenses covering this business had been issued annually for the last 20 years. The basis on which their license was refused was that although after the enactment of a zoning ordinance their business had been licensed as a nonconforming pre-existing use, nevertheless in 1953 the zoning ordinance was amended to outlaw nonconforming uses of this nature at the expiration of three years from the effec *565 tive date of the amendment. For this reason petitioners’ license was not renewed for the year 1956.
The phraseology of this 1953 zoning amendment is important. It reads as follows:
“ § 18. Non-conforming uses and buildings. 1. Continuing existing uses: Except as provided in this section, any nonconforming use of any building, structure, land or premises may be continued. Provided, however, that on premises situate in any ‘ R ’ district each use which is not a conforming use in the ‘ R5 ’ district and which falls into one of the categories hereinafter enumerated shall cease or shall he changed to a conforming use within 3 years from the effective date of- this amended chapter. The requirements of this subdivision for the termination of non-conforming uses shall apply in each of the following eases :
“ (a) Any such non-conforming use involving the use of land only and not accessory to an adjacent building or structure assessed as a real estate improvement.
“ (b) Any such non-conforming use involving the use of or accessory to one or more buildings or structures on the same lot, the aggregate assessed value of which improvements for tax purposes is not more than five hundred dollars ($500.00). “(c) Any such non-conforming use consisting of a sign.
“(d) Any junk yard, auto wrecking or dismantling establishment.” _
'
No contention is made that petitioners’ business has been enlarged, altered in character or abandoned. Neither is the city acting on the basis that the assessed value of buildings or structures on the lot does not exceed $500, although that clause in the ordinance has been mentioned and will be discussed. The city is terminating the continuous use of this real property upon the ground that the real property is being used as a junk yard, and that the amount of capital investment which plaintiffs have made in land or buildings makes no difference inasmuch as three years have elapsed since the zoning amendment^ of 1953.
It appears from the petition, without denial in the answer, that at the insistence of the City of Buffalo petitioners spent $2,000 for the installation of a special sewage system, for use in their business as recently as' 1950. The petition further *566 alleges that at the same time they spent $700 for the installation of a boiler also for use in their business. Although the answer denies that the city has knowledge or information sufficient to form a belief about the boiler, this denial is palpably frivolous in view of the admission that this boiler was inspected by city inspectors for the years 1951 to 1956 inclusive. It is thus established that petitioners had at least $2,700 invested in this construction upon this property, in addition to the other structures and the land.
The plaintiffs’ business is being confiscated, as has been mentioned, not on the basis that the improvements are assessed within $500, but regardless of how much the improvements -may be worth. It is being terminated under the language of this ordinance for the sole reason that it is classified as a junk yard. I agree with what was said by the Appellate Division that “ Whatever the law may be in California or Florida or other jurisdictions, in this State, the rule is as stated in People v. Miller (304 N. Y. 105, 107, 109), to wit: ‘ It is the law of this state that nonconforming uses or structures, in existence when a zoning ordinance is enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provision of the ordinance.’ ” Not less than nine cases are cited in our opinion in People v. Miller (304 N. Y. 105) as authority for this statement (p. 107). Plaintiffs’ business is not a nuisance. It is not injurious to * life or health or morals. The neighbors whose sensibilities are offended would have found difficulty in abating it (even if it j were a nuisance) for the reason that they “ came to the nui- • sanee,” in the time honored phrase, by purchasing and moving into the neighborhood while petitioners’ business was in operation. Neither, in my mind, can the city abolish this business under this ordinance. Even if this case came under the clause abrogating nonconforming uses where the buildings or structures on the lot do not exceed $500 in assessed value, the ordinance would still be unconstitutional. Zoning relates to the future development of municipalities. Areas in cities that « have already been developed cannot be zoned retroactively. That is the function of municipal redevelopment, which is constitutionally authorized by statutes directing payment of just compensation for property that is appropriated. It is *567 arbitrary, in my view, to draw the line at buildings or structures valued at $500 or less. That sum is negligible in the case of large stores or factories, whereas it may represent the savings of years to small proprietors. If the line can be drawn at $500, it will soon be extended to $5,000 or perhaps to $50,000. If, in principle, the city is allowed to confiscate property without payment of just compensation, it is no answer to say that it is taking only $500. It would be a novel proposition that a municipality can take private property for a public use without compensation provided that it does not take too much. Retroactive zoning, as this clearly is, resembles slum clearance more than zoning, which is for the future. If $500 is so small an amount, then why should not the city be obliged to pay it before confiscating this use, by the same token whereby it would be required to pay just compensation in cases of slum clearance? That there is no existing statutory authority to make such a payment in this case is not justification for confiscating the prior use which is a vested right. It would be no answer to argue that the small businessman does not need to be compensated provided that he is small enough. No such rule as that can be applied in zoning administration. If any distinction of that kind were relevant, it would be more appropriate to be guided by what proportion of the businessman’s assets have been invested in improvements to his property. Observing the vagaries of modern zoning, many a businessman (large or small) might properly hesitate to invest his life savings in a store or other commercial or industrial property knowing that his investment is liable to be expropriated after the enterprise has been successfully launched, if some pressure group succeeds in obtaining favorable action from a municipal legislature. That is not in the public interest. Constitutional security against such developments is infinitely more important to the public at large than the occasional presence of a nonconforming use, or the possibility that a nonconforming use may acquire some advantage by way of monopoly in the use district. The comment by Chief Judge Hutcheson, of the United States Court of Appeals in the Fifth Circuit, is relevant in his dissenting opinion in Standard Oil Co. v. City of Tallahassee (183 F. 2d. 410, 413-414): “ recognizing that even in this age of enlightenment the Constitution still *568 protects the citizen against arbitrary and unreasonable action, I am in no doubt that in sustaining this admittedly confiscatory ordinance, a good general principle, the public interest in zoning, has been run into the ground, the tail of legislative confiscation by caprice has been permitted to wag the dog of judicial constitutional protection.” This accords with the statement in Incorporated Vil. of North Hornell v. Rauber (181 Misc. 546, 552): “ Bather is it argued that what used to be called confiscation is justifiable in an enlightened age, if enough people desire it and the amount to be taken away from the owner is not too great.”
An incidental defect in the same subsection of this municipal ordinance is that if the amount of money involved were to be deemed to be controlling on the issue of confiscation, the ordinance could not constitutionally bind the owner to the assessed value of buildings or structures to be taken without compensation. Quoting again from Incorporated Vil. of North Hornell v. Rauber (supra, pp. 552-553): “ The assessed valuation of real estate is some evidence of fair market value. (Matter of Simmons [Ashokan Reservoir], 132 App. Div. 574, 576; Adler v. Berkowitz, 229 App. Div. 245, 249, modified on other grounds 254 N. Y. 433; Heiman v. Bishop, 272 N. Y. 83, 88; President & Directors of Manhattan Co. v. Williams, 152 Misc. 901, 902.) It is to be taken into consideration along with other factors (Heiman v. Rishop, supra), but is not conclusive, and is not made conclusive by the reference to assessed valuation in the zoning ordinance. * * * Certainly the reasonableness of the ordinance in a particular case must be decided on the basis of the real facts. The court cannot be estopped by anything contained in it from deciding whether its operation is confiscatory. The reference to assessed valuation in section 7 does not render less oppressive a deprivation of property without due process of law where the assessed valuation is beneath the true value. The remedy for an inadequate assessed valuation is to raise it, not to put the taxpayer out of business by an injunction.”
In this instance, as has been said, the limitation to $500 assessed valuation in this zoning ordinance does not apply. Petitioners come under a different subdivision which outlaws after three years “ Any junk yard, auto wrecking or dismantl *569 ing .establishment.” This subdivision has no relation to the amount of money invested in physical improvements. In the case of petitioners’ business, it stands admitted by the pleadings that petitioners have recently invested a substantial sum in the improvement of their property at the instance of the city, much more than $500. Junk yards or cooperage businesses are not operated without buildings and other improvements upon the land. Auto dismantling establishments, it is well known, are frequently conducted by unit auto parts companies which require sizable structures in which to dismantle the discarded automobiles and to store and merchandise the variety of used automobile parts and equipment. The reason on account of which these nonconforming uses are interdicted does not relate to the quantity of capital invested in buildings or improvements, but is that they are of a kind which is frequently disliked by the neighbors.
The circumstance that this is a cooperage establishment or junk yard ought not to obscure that the principle of the decision applies to any kind of business which, due to lapse of time, has been overtaken by changes in the neighborhood. The principle of the decision applies equally to stores, shops or service organizations which are retroactively legislated out of existence by the abolition of prior nonconforming uses. If petitioners’ establishment is not secure against this kind of invasion, no one else’s business is better protected. The neighbors or the officials of a municipality in one year may look askance at a junk or cooperage yard, and in another year may frown upon the conduct in a particular locality of any other type of commerce or industry. The people who moved into petitioners’ vicinity and now find their business offensive may not be aware that the principle of this decision unsettles their own property rights, and that it may suddenly be used against them in unexpected ways if agitation arises to legislate them out of business by a similar procedure. It makes little difference what the nature of their businesses may be. The smaller they are the more vulnerable they become to this kind of attack, which is based on the misfortune of unpopularity. Democracy depends upon respect for the individual as well as upon majority rule. The relaxation of constitutional safeguards protecting commonly accepted personal and property *570 rights, goes hand in hand with the multiplication of pressure groups. People should not be obliged to organize to preserve rights the safeguarding of which is the proper function of law. The small manufacturer or merchant feels this acutely, since he ordinarily finds it more difficult to succeed in wielding organized power for his own protection when property rights depend upon the discretion of legislative bodies. No question is raised here concerning the good faith of the enactment or administration of this ordinance. Nevertheless petitioners find themselves confronted by the organized civil power of the municipality, set in motion by the complaints of their neighbors who wish to eliminate them from the locality in which petitioners settled first. If this part of the city is to be redeveloped, it should be done through the enactment of a statute similar in principle to slum clearance acts, whereby just compensation can be paid for private property that is confiscated for a public use. Petitioners have well-recognized legal property rights Avhich ought to be protected in court.
Zoning, as originally conceived, related to the future devel1 opment of municipalities. It was not an attempt to reconstruct :J;he past. Cases such as Village of Euclid v. Ambler Realty Co. (272 U. S. 365) and Lincoln Trust Co. v. Williams Bldg. Corp. (229 N. Y. 313) were decided in this frame of reference. Preexisting nonconforming uses were uniformly excepted from the operation of zoning ordinances, and the proprietors thereof were held to have the constitutional right to continue such uses (People v. Miller, supra; City of Buffalo v. Chadeayne, 134 N. Y. 163; People ex rel. Ortenberg v. Bales, 250 N. Y. 598; Matter of Caponi v. Walsh, 228 App. Div. 86; New York State Investing Corp. v. Brady, 214 App. Div. 592; Matter of Pelham View Apts. v. Switzer, 130 Misc. 545; People v. Stanton, 125 Misc. 215). We are now told that the protection of nonconforming uses in the beginning ■ was a strategem of city planners, 1 ‘ prompted by a fear that the courts would hold unconstitutional any zoning ordinance which attempted to eliminate existing nonconforming uses.” (1951 Wis. L. Rev. 685; 35 Va. L. R. 352, citing Bassett on Zoning, p. 108, n. 1; also Noel, Retroactive Zoning and Nuisances, 41 Col. L. Rev. 457, 473.) The Virginia Law Review note, citing these authorities, states: “ Those who led the zoning movement in its early stages *571 adopted a lenient attitude towards nonconforming buildings. They did so because they did not wish to arouse the animosity of a large segment of property owners at a time when opposition might have jeopardized the whole success of zoning.” The reasoning of these and other commentators, and of some decisions in other States, is that all zoning interferes with property rights to some degree, even in case of unused vacant land, and that now another step should be taken by eliminating pre-existing uses which were formerly held to constitute vested property rights (State ex rel. Dema Realty Co. v. McDonald, 168 La. 172; State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752; Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal. 2d 121; City of Los Angeles v. Gage, 127 Cal. App. 2d 442; Spurgeon v. Board of Comrs. of Shawnee County, 181 Kan. 1008; Standard Oil Co. v. City of Tallahassee, 183 F. 2d 410, cert. denied 340 U. S. 892, supra; Grant v. Mayor & City Council of Baltimore, 212 Md. 301). In the Louisiana cases it was held that a grocery store and a drugstore could be eliminated in one year by passing a zoning ordinance; in the California cases, a plumbing establishment and a cement batching plant were required to be removed respectively in five years and one year after the enactment or amendment of such an ordinance; in the Federal case in Florida, an automobile service station was required to be eliminated on the amendment of such an ordinance in ten years; in the Kansas case an automobile wrecking business was required to be removed within two years; and in the Maryland case billboards, which may be in a different category, were required to be removed from residential areas after a tolerance period of five years. Most of these cases were decided over vigorous dissents. There are decisions to the opposite effect in other states (O’Connor v. City of Moscow, 69 Idaho 37, Anm., 9 A. L. R. 2d 1039; City of Akron v. Chapman, 160 Ohio St. 382, Ann., 42 A. L. R. 2d 1146; J ames v. City of Greenville, 227 S. C. 565; City of Corpus Christi v. Allen, 152 Tex. 137, affg. 247 S. W. 2d 130). Our Town of Somers v. Camarco (308 N. Y. 537) has been cited in the same context (see Grant v. Mayor & City Council of Baltimore, supra). The Texas case held unconstitutional an ordinance compelling' the removal of an automobile salvage and wrecking yard, which is included in the *572 same category as a junk yard under the ordinance of the City of Buffalo under adjudication herein. In American Jurisprudence (Yol. 58, Zoning, § 148 [1948]) the statement is made that “it is generally held that a zoning ordinance may not operate to suppress or remove from a particular district an otherwise lawful business or use already established therein. Even if the general welfare, for the promotion of which zoning legislation is justified, were interpreted to include the protection of economic values of adjacent property, so that the establishment of a new business may be prohibited to protect such value, that is considered a different matter from ousting a business already there, with reference to which the economic value of the adjacent property has long since been fixed.” The 1957 annotation recognizes that “In several cases the validity of such a requirement has been upheld,” but adds: “ However, in a number of cases the view has been taken that an ordinance or other regulation intended to terminate a lawful nonconforming use in existence when such ordinance or regulation was adopted, and permitted to continue thereafter, was invalid, at least as to the particular application sought.” This citation of authority is enough to display the confusion into which this subject is becoming involved in some jurisdictions in consequence of departing from the established rule. The courts find themselves obliged, without any guiding principle, to pick and choose between instances where a prior nonconforming use will or will not be protected in the courts. It is generally implied in discussions of the subject that the sponsors of the zoning movement were merely temporizing with the courts by leading them in the beginning to hold that a prior use constituted a vested right. The facts in the cases cited, where there has been a departure from that rule, illustrate how impossible it would be to confine a ruling like the one in this case to a junk yard, or to determine judicially what would be a reasonable period of time for removal in a specific case within the meaning of the Constitution. In some of them stores were removed, in another a gasoline service station, in one a plumbing shop and in another a cement batching plant. The grace periods allowed bear no discoverable relation to the kinds of property or businesses involved. An auto wrecking establishment was given five years, and a gasoline service *573 station, ten years, whereas a grocery store, drugstore and cement batching establishment were allowed but one year. Different periods purport to be allowed by ordinances elsewhere. Thus it is stated (9 U. Chi. L. Rev. 481-482): “ The proposals vary greatly. Some pertain only to particular uses such as billboards, garages, gasoline stations, and junk yards. Still others attempt to eliminate many more non-conforming uses. Nor are the lengths of the amortization periods uniform. Under some proposals a two-year period is allowed, others allow ten or twenty years. Although most of the provisions are silent as to the administrative techniques by which the amortization provisions are to be applied, the boards of zoning appeals will probably be given varying degrees of discretion by which individual hardships may be mitigated within the larger, less flexible framework of the definite elimination period.”
In practice this spells confusion, instability, inability to diagnose what are legal rights, inconsistency, arbitrariness and discrimination in administrative and court decisions, and an avalanche of litigation. That Pandora’s box is opened, regardless of the best possible intentions on the part of all concerned. Nor is the judgment appealed from an unwarranted interference by the courts in the province of the municipal legislature. It simply follows precedent from the beginning of zoning practice. The new rule has the additional infirmity that it opens wide new fields of discretion in administrative law without any workable standards by which it is to be guided.
The lack of any principle in applying the novel theory of- “ amortization ” betrays a fundamental weakness in the theory. Zoning, like other public programs, is not always best administered at the hands of its enthusiasts. The existence of nonconforming uses has spoiled the symmetry in the minds of zoning experts. It has bulked so large in this context that, desirable as the elimination of nonconforming uses may be,- it has sometimes been presented as though it were more important than ordinary property rights. ‘1 Many means of eliminating and controlling nonconforming uses have been proposed and tried. Among these means are retroactive zoning, amortization of nonconforming uses, abatement of nonconforming uses as nuisances, public purchase and eminent domain, prohibition of *574 the resumption of a nonconforming use after a period of discontinuance, and refusal to provide governmental services to nonconforming users ” (1951 Wis. L. Eev. 687). This Wisconsin Law Eeview article points out how most of these different proposals have been tried and found wanting, particularly the method by exercising the power of eminent domain which is said to have been discarded mainly for the reason that it is too expensive. The same is said at page 93 of Volume 102 of the Pennsylvania Law Eeview. The fault found with eminent domain is that it failed to achieve the object of destroying the owner’s right in his property without paying for it. Consequently the most promising legal theory at the moment is known as “ amortization”. This theory is discussed in some of the cases and in most of the law review articles which have been cited as upholding constitutionality of these measures. “ Amortization ” is explained as follows :* “ ‘ The only positive method of getting rid of nonconforming uses yet devised is to amortize a nonconforming building. That is, to determine the normal useful remaining life of the building and prohibit the owner from maintaining it after the expiration of that time. ’ ’ ’ The opinion in City of Los Angeles v. Gage (p. 455) adds: “ The length of time given the owner to eliminate his nonconforming use or building varies with the city and with the type of structure.”
This theory to justify extinguishing nonconforming uses means less the more one thinks about it. It offers little more promise of ultimate success than the other theories which have been tried and abandoned. In the first place, the periods of time vary so widely in the cases which have been cited from different States where it has been tried, and have so little relation to the useful lives of the structures, that this theory cannot be used to reconcile these discordant decisions. Moreover the term “ amortization”, as thus employed, has not the same meaning which it carries in law or accounting. It is not even used by analogy. It is just a catch phrase, and the reasoning is reduced to argument by metaphor. Not only has no effort been made in the reported cases where this theory has been *575 applied to determine what is the useful life of the structure, but almost all were decided under ordinances or statutes which prescribe the same time limit for many different kinds of improvements. This demonstrates that it is not attempted to measure the life of the particular building or type of building, and that the word “ amortization ” is used as an empty shibboleth. This comment applies to the ordinance at issue on this appeal. There could be no presumption that all junk yards, all auto wrecking or dismantling establishments, and all improvements assessed for tax purposes at not more than $500 will or have any tendency to depreciate to zero in three years. This shows that the ordinance in suit could not possibly have been based on the amortization theory.
Moreover this theory, if it were seriously advanced, would imply that the owner should not keep up his property by making necessary replacements to restore against the ravages of time. Such replacements would be money thrown away. The amortization theory would thus encourage owners of nonconforming uses to allow them to decay and become slums.
Although the courts of other States are divided on this question, the better reason seems to me to be on the side of the rule heretofore established in this State, wherefore I vote to affirm.
Judge Burke concurs with Judge Froessel; Judges Desmond and Fuld concur in result upon the principles stated in People v. Miller (304 N. Y. 105, 108, 109); Judge Van Voorhis dissents in an opinion in which Chief Judge Conway and Judge Dye concur.
Order reversed, etc.

 Crolly and Norton, Termination of Nonconforming Uses, 62 Zoning Bulletin 1, Regional Plan Assn., June, 1952, quoted in City of Los Angeles v. Gage, supra, pp. 454-455.