4 N.Y.2d 553 (1958)
In the Matter of Andrew Harbison, Sr., et al., Respondents,
v.
City of Buffalo et al., Appellants.
Court of Appeals of the State of New York.
Argued February 17, 1958.
Decided June 25, 1958.
Anthony Manguso, Corporation Counsel (William J. Ostrowski of counsel), for appellants.
James J. White for respondents.
Judge BURKE concurs with Judge FROESSEL; Judges DESMOND and FULD concur in result upon the principles stated in People v. Miller (304 N.Y. 105, 108, 109); Judge VAN VOORHIS dissents in an opinion in which Chief Judge CONWAY and Judge DYE concur.
*555 FROESSEL, J.
Petitioner Andrew Harbison, Sr., purchased certain real property located at 35 Cumberland Avenue in the city of Buffalo on January 5, 1924. Shortly thereafter he erected a 30- by 40-foot-frame building thereon, and commenced *556 operating a cooperage business, which, with his son, he has continued to date. The building has not been enlarged, and the volume of petitioners' business is stated to be the same now as then. The only difference is that, whereas petitioners formerly dealt mainly with wooden barrels, they now recondition, clean and paint "used" steel drums or barrels. No issue of that difference is made here. These drums, or barrels, are stacked to a height of about 10 feet in the yard, and on an average day about 600 or 700 barrels are stored there.
When petitioner Andrew Harbison, Sr., established his business in 1924, the street upon which it was located was an unpaved extension of an existing street, the city operated a dump in the area, and there was a glue factory in the vicinity. At the present time, the glue factory has gone, and there are residences adjoining both sides of petitioners' property and across the street. The change in the surrounding area is reflected by the fact that in 1924 the land was unzoned, but since 1926 (except for the period between 1949 and 1953, when it was zoned for business), the land has been zoned for residential use; and it is presently in an "R3" dwelling district.
Thus it is clear that at the time of the enactment of the first zoning ordinance affecting the premises, petitioners had an existing nonconforming use, that is, the conduct of a cooperage business in a residential zone. In 1936, under an ordinance which included the operations of petitioners in a definition of "junk dealers", petitioners applied for and received a license to carry on their business. Licenses were obtained by petitioners every year from 1936 through the fiscal year of 1956.
However, the ordinances of the City of Buffalo were amended, effective as of July 30, 1953, so as to state in chapter LXX (§ 18): "1. Continuing existing uses: Except as provided in this section, any non-conforming use of any building, structure, land or premises may be continued. Provided, however, that on premises situate in any `R' district each use which is not a conforming use in the `R5' district and which falls into one of the categories hereinafter enumerated shall cease or shall be changed to a conforming use within 3 years from the effective date of this amended chapter. The requirements of this subdivision for the termination of non-conforming uses *557 shall apply in each of the following cases: * * *. (d) Any junk yard". (Defined in § 23, subd. 24.)
On November 27, 1956 the director of licenses of the City of Buffalo sent a letter to petitioners stating: "At a meeting of the Common Council under date of November 13, 1956 * * * [it] evinced its intention not to amend or modify the provisions of Chapter 18, Subdivision I of Chapter LXX of the Ordinances relating to non-conforming uses by junk yards * * * in `R' districts. * * * you are hereby notified to discontinue the operation of your junk yard * * * at once". A subsequent application by petitioners for a wholesale junk license and one for a "drum reconditioning license" were refused on the ground that "said premises lie within an area zoned as `R3' Dwelling District * * * and the operation of a junk yard and the outside storage of used materials is prohibited therein". Petitioners then brought this article 78 proceeding in the nature of mandamus in which they sought an order directing the city to issue a wholesale junk license to them, and the lower courts sustained them.
On this appeal, the City of Buffalo argues (1) that petitioners did not have a lawful nonconforming use when the zoning ordinance was enacted in 1926, since at that time they had not complied with an ordinance enacted in 1892 requiring the licensing of wholesale junk dealers; (2) that petitioners are not entitled to the peremptory grant of a license since they have not enclosed their premises with a solid wood or sheet metal fence or masonry wall not less than 6 feet high, as required by section 194 of article XIII of chapter V of the ordinance, and (3) that the ordinance, held invalid by the courts below, is a valid exercise of the police power.
The first point need not detain us long. The ordinance of 1892, upon which the city relies, related to "the business of purchasing or selling old silver, iron, brass, copper scraps or other secondhand or partially ruined or damaged materials, [or] carry[ing] on * * * a junk shop". It is argued that this ordinance does not clearly encompass petitioners' business of repairing and reconditioning barrels. In any event, I might note that petitioners operated a licensed wholesale junk business from 1936 to 1956, and the city never raised the foregoing *558 objection on any of the applications for renewal of the license. Hence this argument has no merit.
Nor does the second point appear to be a sound ground for refusal to issue a license here. If, as appears, petitioners have not complied with the letter of the ordinance since their property is enclosed by a picket fence rather than one of solid wood or metal, an order directing the issuance of a license could readily be conditioned upon compliance with such provisions inasmuch as petitioners are quite willing to comply with this requirement. It may be noted that this defense was not interposed until the close of the hearings.
In the major point involved on this appeal, the city argues that the ordinance requiring the termination of petitioners' nonconforming use of the premises as a junk yard within three years of the date of said ordinance is a valid exercise of its police power. Its claim is not based on the theory of nuisance (see People v. Miller, 304 N.Y. 105, 107, and cases there cited; Noel, Retroactive Zoning and Nuisances, 41 Col. L. Rev. 457), and indeed this record contains little evidence as to the manner of operation of petitioners' business and the nature of the surrounding neighborhood. Rather, in this case, the city bases its claim largely on out-of-State decisions which have sustained ordinances requiring the termination of nonconforming uses or structures after a period of permitted continuance, where such "amortization" period was held reasonable.
When zoning ordinances are initially adopted to limit permissible uses of property, or when property is rezoned so as to prevent uses of property previously allowed, a degree of protection is constitutionally required to be given owners of property then using their premises in a manner forbidden by the ordinance. Thus we have held that, where substantial expenditures were made in the commencement of the erection of a building, a zoning ordinance may not deprive the owner of the "vested right" to complete the structure (People ex rel. Ortenberg v. Bales, 250 N.Y. 598; see City of Buffalo v. Chadeayne, 134 N.Y. 163, 165). So, where the owner already has structures on the premises, he cannot be directed to cease using them (see Matter of 440 East 102nd St. Realty Corp. v. Murdock, 285 N.Y. 298, 304-305), just as he has the right to continue a prior business carried on there (Town of Somers v. Camarco, 308 N.Y. 537; *559 Matter of Crossroads Recreation v. Broz, 4 N Y 2d 39; People v. Miller, supra).
However, where the benefit to the public has been deemed of greater moment than the detriment to the property owner, we have sustained the prohibition of continuation of prior nonconforming uses. These cases involved the prior use of property for parking lots (People v. Wolfe, 272 N.Y. 608, motion for reargument denied 273 N.Y. 498; People v. Kesbec, Inc., 281 N.Y. 785, motion for reargument denied 282 N.Y. 676). We have also upheld the restriction of projected uses of the property where, at the time of passage of the ordinance, there had been no substantial investment in the nonconforming use (e.g., New York Trap Rock Corp. v. Town of Clarkstown, 3 N Y 2d 844; Rice v. Van Vranken, 255 N.Y. 541; Matter of Fox Lane Corp. v. Mann, 243 N.Y. 550). In these cases, there is no doubt that the property owners incurred a loss in the value of their property and otherwise as a result of the fact that they were unable to carry out their prospective uses; but we held that such a deprivation was not violative of the owners' constitutional rights. In People v. Miller (supra, p. 108), we explained these cases by stating that they involved situations in which the property owners would sustain only a "relatively slight and insubstantial" loss.
It should be noted that even where the zoning authorities may not prohibit a prior nonconforming use, they may adopt regulations which restrict the right of the property owner to enlarge or extend the use or to rebuild or make alterations to the structures on the property (Matter of Koeber v. Bedell, 280 N.Y. 692; Matter of Cordes v. Moore, 308 N.Y. 761; Marcus v. Village of Mamaroneck, 283 N.Y. 325; Town of Hempstead v. Goldblatt, 4 A D 2d 970, motion for leave to appeal denied 4 N Y 2d 674; see Matter of Crossroads Recreation v. Broz, supra).
As these cases indicate, our approach to the problem of permissible restrictions on nonconforming uses has recognized that, while the benefit accruing to the public in terms of more complete and effective zoning does not justify the immediate destruction of substantial businesses or structures developed or built prior to the ordinance (People v. Miller, supra, p. 108), the policy of zoning embraces the concept of the ultimate *560 elimination of nonconforming uses, and thus the courts favor reasonable restriction of them. But, where the zoning ordinance could have required the cessation of a sand and gravel business on one year's notice, we have held it unconstitutional (Town of Somers v. Camarco, 308 N.Y. 537, supra).
The development of the policy that nonconforming uses should be protected and their existence preserved at the stage of development existing at the time of passage of the ordinance seems to have been based upon the assumption that the ultimate ends of zoning would be accomplished as the nonconforming use terminated with time. But this has not proven to be the case, as commentators have noted that the tendency of many of these uses is to flourish, capitalizing on the fact that no new use of that nature could be begun in the area (see, e.g., 9 U. Chi. L. Rev. 477, 479, 481; 102 U. Pa. L. Rev. 91, 94; 35 Va. L. Rev. 348, 352-353; 1951 Wis. L. Rev. 685). Because of this situation, communities have sought new forms of ordinances restricting nonconforming uses, and in particular have turned to provisions which require termination after a given period of time.
With the exception of a decision of the Ohio Supreme Court (which may be explained on the basis of the particular language and application of the ordinance) in City of Akron v. Chapman (160 Ohio St. 382 [criticized in 67 Harv. L. Rev. 1283]), the decisions have sustained ordinances where the time provided was held reasonable (Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal. 2d 121, 123-127; City of Los Angeles v. Gage, 127 Cal. App. 2d 442, 453-458; Standard Oil Co. v. City of Tallahassee, 183 F.2d 410, cert. denied 340 U. S. 892; Spurgeon v. Board of Comrs. of Shawnee County, 181 Kan. 1008; Grant v. Mayor & City Council of Baltimore, 212 Md. 301; State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752; State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, cert. denied 280 U. S. 556; see Robinson Brick Co. v. Luthi, 115 Col. 106, 111-112; City of Corpus Christi v. Allen, 152 Tex. 137, 142; Stoner McCray System v. City of Des Moines, 247 Iowa 1313, 1320; United Adv. Co. v. Borough of Raritan, 11 N. J. 144, 152).
A number of States and municipal bodies have adopted statutes authorizing this approach to the problem (as, e.g., Ill. Ann. Stat., ch. 24, § 73-1; 3 Va. Code [1950], § 15-843; *561 see, also, list in n. 1 in Grant v. Mayor & City Council of Baltimore, supra); and the textwriters generally express the opinion that they would be constitutional if reasonable (1 Antieau on Municipal Corporation Law, § 7.03[3]; Bassett on Zoning, pp. 115-116; 8 McQuillin on Municipal Corporations [3d ed.], § 25.190; see, also, Law Reviews cited supra). Bassett, in his text on Zoning, states (p. 115) that "Several ordinances in Long Island provide [for] * * * the ousting of automobile junk yards with accessory buildings * * * the owner being given from three to six years to amortize."
Leaving aside eminent domain and nuisance, we have often stated in our decisions that the owner of land devoted to a prior nonconforming use, or on which a prior nonconforming structure exists (or has been substantially commenced), has the right to continue such use, but we have never held that this right may continue virtually in perpetuity. Now that we are for the first time squarely faced with the problem as to whether or not this right may be terminated after a reasonable period, during which the owner may have a fair opportunity to amortize his investment and to make future plans, we conclude that it may be, in accordance with the overwhelming weight of authority found in the courts of our sister States, as well as with the textwriters and commentators who have expressed themselves upon the subject.
With regard to prior nonconforming structures, reasonable termination periods based upon the amortized life of the structure are not, in our opinion, unconstitutional. They do not compel the immediate destruction of the improvements, but envision and allow for their normal life without extensive alterations or repairs. Such a regulation is akin to those we have sustained relating to restrictions upon the extension or substantial repair or replacement of prior nonconforming structures.
As to prior nonconforming uses, the closest case we have had is Town of Somers v. Camarco (308 N.Y. 537, supra; see discussion thereof in this connection in 7 Syracuse L. Rev. 158-161). In that case we held that, in view of defendant's investment and the business which had been built up and carried on over the years, the provisions of the ordinance which required defendant to apply for a permit to continue its business *562 every year, and provided further that on the termination of any approval period any structure or improvement on the premises could be ordered removed and the premises restored to their original condition as nearly as practicable, were unreasonable. There the land involved had unusual resources which made it especially suitable for the nonconforming use carried on; the improvements were necessary for the operation of the business, and the period of termination was unreasonably short. Under these circumstances the ordinance would have deprived the property owner of his "vested rights". As was pointed out in the opinion (pp. 540-541), "The courts, in order to afford stability to property owners who do have existing nonconforming uses, have imposed the test of reasonableness upon such exercise of the police powers. Therefore broad general rules and tests, such as expressed in People v. Miller (304 N.Y. 105), must always be considered in this context."
If, therefore, a zoning ordinance provides a sufficient period of permitted nonconformity, it may further provide that at the end of such period the use must cease. This rule is analogous to that with respect to nonconforming structures. In ascertaining the reasonable period during which an owner of property must be allowed to continue a nonconforming use, a balance must be found between social harm and private injury. We cannot say that a legislative body may not in any case, after consideration of the factors involved, conclude that the termination of a use after a period of time sufficient to allow a property owner an opportunity to amortize his investment and make other plans is a valid method of solving the problem.
To enunciate a contrary rule would mean that the use of land for such purposes as a tennis court, an open air skating rink, a junk yard or a parking lot  readily transferable to another site  at the date of the enactment of a zoning ordinance vests the owner thereof with the right to utilize the land in that manner in perpetuity, regardless of the changes in the neighborhood over the course of time. In the light of our ever expanding urban communities, such a rule appears to us to constitute an unwarranted restriction upon the Legislature in dealing with what has been described as "One of the major problems in effective administration of modern zoning ordinances" (1951 Wis. L. Rev. 685). When the termination provisions *563 are reasonable in the light of the nature of the business of the property owner, the improvements erected on the land, the character of the neighborhood, and the detriment caused the property owner, we may not hold them constitutionally invalid.
In the present case, the two lower courts have expressed the view that, "Whatever the law may be in California or Florida or other jurisdictions, in this State" no regulation infringing at any time the perpetual right of an owner to continue a prior nonconforming use is valid. Accordingly, neither court considered the question of whether the particular period prescribed by the ordinance was reasonable under the facts of this case.
Their conclusion is not in accord with the general rule applicable to protection of nonconforming uses as stated in People v. Miller (304 N.Y. 105, supra). In that case we decided that where the enforcement of an ordinance requiring the termination of a prior nonconforming use caused "relatively slight and insubstantial" loss to the property owner, it would be constitutional. While it is true that the ordinance there involved did not have an "amortization" provision, nevertheless the general test enunciated is no less germane when such a provision is included in the ordinance. As previously pointed out, the period of "amortization" allowed by the ordinance is a crucial factor in determining whether the ordinance has been constitutionally applied in a given case.
Here, petitioners are engaged in the business of reconditioning barrels or used steel drums. We are told that the value of the property together wth the improvements is $20,000; but there is no indication of the relative value of the land and improvements separately. It was further alleged that the improvement consists of a 30- by 40-foot-frame building erected in 1924, and, in addition thereto, petitioners claim that at the insistence of the City of Buffalo, three years before the ordinance went into effect, they were obliged to install a special sewage system at a cost of $2,000 and a boiler at a cost of $700.
Material triable issues of fact thus remain, and a further hearing should adduce evidence relating to the nature of the surrounding neighborhood, the value and condition of the improvements on the premises, the nearest area to which petitioners *564 might relocate, the cost of such relocation, as well as any other reasonable costs which bear upon the kind and amount of damages which petitioners might sustain, and whether petitioners might be able to continue operation of their business if not allowed to continue storage of barrels or steel drums outside their frame building. It is only upon such evidence that it may be ascertained whether the resultant injury to petitioners would be so substantial that the ordinance would be unconstitutional as applied to the particular facts of this case.
The order of the Appellate Division should be reversed, without costs, and the matter remanded to Special Term for a trial of the material issues and further proceedings as outlined in this opinion.
VAN VOORHIS, J. (dissenting).
The decision which is about to be rendered marks, in my view, the beginning of the end of the constitutional protection of property rights in this State in pre-existing nonconforming uses under zoning ordinances. Special Term and the Appellate Division unanimously followed the existing law in holding this amendment to the zoning ordinance of the City of Buffalo to be unconstitutional. In my view the traditional rule is right, and should not be abrogated.
Petitioners-respondents in 1924 began what has been described as a wholesale junk yard business at 35 Cumberland Avenue, in that city. Their principal line has been cooperage, although the city recognizes no distinction between that and the junk business. The opposite side of the street, at that time, was a rubbish dump being filled in by the city. Later residences commenced to be built in the area, after the fill had settled across the street, and the residential newcomers did not like the continuance of petitioners' business in their new neighborhood. Although petitioners' business has been conducted legally in every respect, the City of Buffalo refused to renew their license for 1956, although licenses covering this business had been issued annually for the last 20 years. The basis on which their license was refused was that although after the enactment of a zoning ordinance their business had been licensed as a nonconforming pre-existing use, nevertheless in 1953 the zoning ordinance was amended to outlaw nonconforming uses of this nature at the expiration of three years from the effective *565 date of the amendment. For this reason petitioners' license was not renewed for the year 1956.
The phraseology of this 1953 zoning amendment is important. It reads as follows:
"§ 18. Non-conforming uses and buildings. 1. Continuing existing uses: Except as provided in this section, any non-conforming use of any building, structure, land or premises may be continued. Provided, however, that on premises situate in any `R' district each use which is not a conforming use in the `R5' district and which falls into one of the categories hereinafter enumerated shall cease or shall be changed to a conforming use within 3 years from the effective date of this amended chapter. The requirements of this subdivision for the termination of non-conforming uses shall apply in each of the following cases:
"(a) Any such non-conforming use involving the use of land only and not accessory to an adjacent building or structure assessed as a real estate improvement.
"(b) Any such non-conforming use involving the use of or accessory to one or more buildings or structures on the same lot, the aggregate assessed value of which improvements for tax purposes is not more than five hundred dollars ($500.00).
"(c) Any such non-conforming use consisting of a sign.
"(d) Any junk yard, auto wrecking or dismantling establishment."
No contention is made that petitioners' business has been enlarged, altered in character or abandoned. Neither is the city acting on the basis that the assessed value of buildings or structures on the lot does not exceed $500, although that clause in the ordinance has been mentioned and will be discussed. The city is terminating the continuous use of this real property upon the ground that the real property is being used as a junk yard, and that the amount of capital investment which plaintiffs have made in land or buildings makes no difference inasmuch as three years have elapsed since the zoning amendment of 1953.
It appears from the petition, without denial in the answer, that at the insistence of the City of Buffalo petitioners spent $2,000 for the installation of a special sewage system for use in their business as recently as 1950. The petition further *566 alleges that at the same time they spent $700 for the installation of a boiler also for use in their business. Although the answer denies that the city has knowledge or information sufficient to form a belief about the boiler, this denial is palpably frivolous in view of the admission that this boiler was inspected by city inspectors for the years 1951 to 1956 inclusive. It is thus established that petitioners had at least $2,700 invested in this construction upon this property, in addition to the other structures and the land.
The plaintiffs' business is being confiscated, as has been mentioned, not on the basis that the improvements are assessed within $500, but regardless of how much the improvements may be worth. It is being terminated under the language of this ordinance for the sole reason that it is classified as a junk yard. I agree with what was said by the Appellate Division that "Whatever the law may be in California or Florida or other jurisdictions, in this State, the rule is as stated in People v. Miller (304 N.Y. 105, 107, 109), to wit: `It is the law of this state that nonconforming uses or structures, in existence when a zoning ordinance is enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provision of the ordinance.'" Not less than nine cases are cited in our opinion in People v. Miller (304 N.Y. 105) as authority for this statement (p. 107). Plaintiffs' business is not a nuisance. It is not injurious to life or health or morals. The neighbors whose sensibilities are offended would have found difficulty in abating it (even if it were a nuisance) for the reason that they "came to the nuisance," in the time honored phrase, by purchasing and moving into the neighborhood while petitioners' business was in operation. Neither, in my mind, can the city abolish this business under this ordinance. Even if this case came under the clause abrogating nonconforming uses where the buildings or structures on the lot do not exceed $500 in assessed value, the ordinance would still be unconstitutional. Zoning relates to the future development of municipalities. Areas in cities that have already been developed cannot be zoned retroactively. That is the function of municipal redevelopment, which is constitutionally authorized by statutes directing payment of just compensation for property that is appropriated. It is *567 arbitrary, in my view, to draw the line at buildings or structures valued at $500 or less. That sum is negligible in the case of large stores or factories, whereas it may represent the savings of years to small proprietors. If the line can be drawn at $500, it will soon be extended to $5,000 or perhaps to $50,000. If, in principle, the city is allowed to confiscate property without payment of just compensation, it is no answer to say that it is taking only $500. It would be a novel proposition that a municipality can take private property for a public use without compensation provided that it does not take too much. Retroactive zoning, as this clearly is, resembles slum clearance more than zoning, which is for the future. If $500 is so small an amount, then why should not the city be obliged to pay it before confiscating this use, by the same token whereby it would be required to pay just compensation in cases of slum clearance? That there is no existing statutory authority to make such a payment in this case is not justification for confiscating the prior use which is a vested right. It would be no answer to argue that the small businessman does not need to be compensated provided that he is small enough. No such rule as that can be applied in zoning administration. If any distinction of that kind were relevant, it would be more appropriate to be guided by what proportion of the businessman's assets have been invested in improvements to his property. Observing the vagaries of modern zoning, many a businessman (large or small) might properly hesitate to invest his life savings in a store or other commercial or industrial property knowing that his investment is liable to be expropriated after the enterprise has been successfully launched, if some pressure group succeeds in obtaining favorable action from a municipal legislature. That is not in the public interest. Constitutional security against such developments is infinitely more important to the public at large than the occasional presence of a nonconforming use, or the possibility that a nonconforming use may acquire some advantage by way of monopoly in the use district. The comment by Chief Judge HUTCHESON, of the United States Court of Appeals in the Fifth Circuit, is relevant in his dissenting opinion in Standard Oil Co. v. City of Tallahassee (183 F. 2d. 410, 413-414): "recognizing that even in this age of enlightenment the Constitution still *568 protects the citizen against arbitrary and unreasonable action, I am in no doubt that in sustaining this admittedly confiscatory ordinance, a good general principle, the public interest in zoning, has been run into the ground, the tail of legislative confiscation by caprice has been permitted to wag the dog of judicial constitutional protection." This accords with the statement in Incorporated Vil. of North Hornell v. Rauber (181 Misc. 546, 552): "Rather is it argued that what used to be called confiscation is justifiable in an enlightened age, if enough people desire it and the amount to be taken away from the owner is not too great."
An incidental defect in the same subsection of this municipal ordinance is that if the amount of money involved were to be deemed to be controlling on the issue of confiscation, the ordinance could not constitutionally bind the owner to the assessed value of buildings or structures to be taken without compensation. Quoting again from Incorporated Vil. of North Hornell v. Rauber (supra, pp. 552-553): "The assessed valuation of real estate is some evidence of fair market value. (Matter of Simmons [Ashokan Reservoir], 132 App. Div. 574, 576; Adler v. Berkowitz, 229 App. Div. 245, 249, modified on other grounds 254 N.Y. 433; Heiman v. Bishop, 272 N.Y. 83, 88; President & Directors of Manhattan Co. v. Williams, 152 Misc. 901, 902.) It is to be taken into consideration along with other factors (Heiman v. Bishop, supra), but is not conclusive, and is not made conclusive by the reference to assessed valuation in the zoning ordinance. * * * Certainly the reasonableness of the ordinance in a particular case must be decided on the basis of the real facts. The court cannot be estopped by anything contained in it from deciding whether its operation is confiscatory. The reference to assessed valuation in section 7 does not render less oppressive a deprivation of property without due process of law where the assessed valuation is beneath the true value. The remedy for an inadequate assessed valuation is to raise it, not to put the taxpayer out of business by an injunction."
In this instance, as has been said, the limitation to $500 assessed valuation in this zoning ordinance does not apply. Petitioners come under a different subdivision which outlaws after three years "Any junk yard, auto wrecking or dismantling *569 establishment." This subdivision has no relation to the amount of money invested in physical improvements. In the case of petitioners' business, it stands admitted by the pleadings that petitioners have recently invested a substantial sum in the improvement of their property at the instance of the city, much more than $500. Junk yards or cooperage businesses are not operated without buildings and other improvements upon the land. Auto dismantling establishments, it is well known, are frequently conducted by unit auto parts companies which require sizable structures in which to dismantle the discarded automobiles and to store and merchandise the variety of used automobile parts and equipment. The reason on account of which these nonconforming uses are interdicted does not relate to the quantity of capital invested in buildings or improvements, but is that they are of a kind which is frequently disliked by the neighbors.
The circumstance that this is a cooperage establishment or junk yard ought not to obscure that the principle of the decision applies to any kind of business which, due to lapse of time, has been overtaken by changes in the neighborhood. The principle of the decision applies equally to stores, shops or service organizations which are retroactively legislated out of existence by the abolition of prior nonconforming uses. If petitioners' establishment is not secure against this kind of invasion, no one else's business is better protected. The neighbors or the officials of a municipality in one year may look askance at a junk or cooperage yard, and in another year may frown upon the conduct in a particular locality of any other type of commerce or industry. The people who moved into petitioners' vicinity and now find their business offensive may not be aware that the principle of this decision unsettles their own property rights, and that it may suddenly be used against them in unexpected ways if agitation arises to legislate them out of business by a similar procedure. It makes little difference what the nature of their businesses may be. The smaller they are the more vulnerable they become to this kind of attack, which is based on the misfortune of unpopularity. Democracy depends upon respect for the individual as well as upon majority rule. The relaxation of constitutional safeguards protecting commonly accepted personal and property *570 rights, goes hand in hand with the multiplication of pressure groups. People should not be obliged to organize to preserve rights the safeguarding of which is the proper function of law. The small manufacturer or merchant feels this acutely, since he ordinarily finds it more difficult to succeed in wielding organized power for his own protection when property rights depend upon the discretion of legislative bodies. No question is raised here concerning the good faith of the enactment or administration of this ordinance. Nevertheless petitioners find themselves confronted by the organized civil power of the municipality, set in motion by the complaints of their neighbors who wish to eliminate them from the locality in which petitioners settled first. If this part of the city is to be redeveloped, it should be done through the enactment of a statute similar in principle to slum clearance acts, whereby just compensation can be paid for private property that is confiscated for a public use. Petitioners have well-recognized legal property rights which ought to be protected in court.
Zoning, as originally conceived, related to the future development of municipalities. It was not an attempt to reconstruct the past. Cases such as Village of Euclid v. Ambler Realty Co. (272 U. S. 365) and Lincoln Trust Co. v. Williams Bldg. Corp. (229 N.Y. 313) were decided in this frame of reference. Preexisting nonconforming uses were uniformly excepted from the operation of zoning ordinances, and the proprietors thereof were held to have the constitutional right to continue such uses (People v. Miller, supra; City of Buffalo v. Chadeayne, 134 N.Y. 163; People ex rel. Ortenberg v. Bales, 250 N.Y. 598; Matter of Caponi v. Walsh, 228 App. Div. 86; New York State Investing Corp. v. Brady, 214 App. Div. 592; Matter of Pelham View Apts. v. Switzer, 130 Misc. 545; People v. Stanton, 125 Misc. 215). We are now told that the protection of nonconforming uses in the beginning was a strategem of city planners, "prompted by a fear that the courts would hold unconstitutional any zoning ordinance which attempted to eliminate existing nonconforming uses." (1951 Wis. L. Rev. 685; 35 Va. L. R. 352, citing Bassett on Zoning, p. 108, n. 1; also Noel, Retroactive Zoning and Nuisances, 41 Col. L. Rev. 457, 473.) The Virginia Law Review note, citing these authorities, states: "Those who led the zoning movement in its early stages *571 adopted a lenient attitude towards nonconforming buildings. They did so because they did not wish to arouse the animosity of a large segment of property owners at a time when opposition might have jeopardized the whole success of zoning." The reasoning of these and other commentators, and of some decisions in other States, is that all zoning interferes with property rights to some degree, even in case of unused vacant land, and that now another step should be taken by eliminating pre-existing uses which were formerly held to constitute vested property rights (State ex rel. Dema Realty Co. v. McDonald, 168 La. 172; State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752; Livingston Rock & Gravel Co. v. County of Los Angeles, 43 Cal. 2d 121; City of Los Angeles v. Gage, 127 Cal. App. 2d 442; Spurgeon v. Board of Comrs. of Shawnee County, 181 Kan. 1008; Standard Oil Co. v. City of Tallahassee, 183 F.2d 410, cert. denied 340 U. S. 892, supra; Grant v. Mayor & City Council of Baltimore, 212 Md. 301). In the Louisiana cases it was held that a grocery store and a drugstore could be eliminated in one year by passing a zoning ordinance; in the California cases, a plumbing establishment and a cement batching plant were required to be removed respectively in five years and one year after the enactment or amendment of such an ordinance; in the Federal case in Florida, an automobile service station was required to be eliminated on the amendment of such an ordinance in ten years; in the Kansas case an automobile wrecking business was required to be removed within two years; and in the Maryland case billboards, which may be in a different category, were required to be removed from residential areas after a tolerance period of five years. Most of these cases were decided over vigorous dissents. There are decisions to the opposite effect in other states (O'Connor v. City of Moscow, 69 Idaho 37, Ann., 9 A. L. R. 2d 1039; City of Akron v. Chapman, 160 Ohio St. 382, Ann., 42 A. L. R. 2d 1146; James v. City of Greenville, 227 S. C. 565; City of Corpus Christi v. Allen, 152 Tex. 137, affg. 247 S. W. 2d 130). Our Town of Somers v. Camarco (308 N.Y. 537) has been cited in the same context (see Grant v. Mayor & City Council of Baltimore, supra). The Texas case held unconstitutional an ordinance compelling the removal of an automobile salvage and wrecking yard, which is included in the *572 same category as a junk yard under the ordinance of the City of Buffalo under adjudication herein. In American Jurisprudence (Vol. 58, Zoning, § 148 [1948]) the statement is made that "it is generally held that a zoning ordinance may not operate to suppress or remove from a particular district an otherwise lawful business or use already established therein. Even if the general welfare, for the promotion of which zoning legislation is justified, were interpreted to include the protection of economic values of adjacent property, so that the establishment of a new business may be prohibited to protect such value, that is considered a different matter from ousting a business already there, with reference to which the economic value of the adjacent property has long since been fixed." The 1957 annotation recognizes that "In several cases the validity of such a requirement has been upheld," but adds: "However, in a number of cases the view has been taken that an ordinance or other regulation intended to terminate a lawful nonconforming use in existence when such ordinance or regulation was adopted, and permitted to continue thereafter, was invalid, at least as to the particular application sought."
This citation of authority is enough to display the confusion into which this subject is becoming involved in some jurisdictions in consequence of departing from the established rule. The courts find themselves obliged, without any guiding principle, to pick and choose between instances where a prior non-conforming use will or will not be protected in the courts. It is generally implied in discussions of the subject that the sponsors of the zoning movement were merely temporizing with the courts by leading them in the beginning to hold that a prior use constituted a vested right. The facts in the cases cited, where there has been a departure from that rule, illustrate how impossible it would be to confine a ruling like the one in this case to a junk yard, or to determine judicially what would be a reasonable period of time for removal in a specific case within the meaning of the Constitution. In some of them stores were removed, in another a gasoline service station, in one a plumbing shop and in another a cement batching plant. The grace periods allowed bear no discoverable relation to the kinds of property or businesses involved. An auto wrecking establishment was given five years, and a gasoline service *573 station ten years, whereas a grocery store, drugstore and cement batching establishment were allowed but one year. Different periods purport to be allowed by ordinances elsewhere. Thus it is stated (9 U. Chi. L. Rev. 481-482): "The proposals vary greatly. Some pertain only to particular uses such as billboards, garages, gasoline stations, and junk yards. Still others attempt to eliminate many more non-conforming uses. Nor are the lengths of the amortization periods uniform. Under some proposals a two-year period is allowed, others allow ten or twenty years. Although most of the provisions are silent as to the administrative techniques by which the amortization provisions are to be applied, the boards of zoning appeals will probably be given varying degrees of discretion by which individual hardships may be mitigated within the larger, less flexible framework of the definite elimination period."
In practice this spells confusion, instability, inability to diagnose what are legal rights, inconsistency, arbitrariness and discrimination in administrative and court decisions, and an avalanche of litigation. That Pandora's box is opened, regardless of the best possible intentions on the part of all concerned. Nor is the judgment appealed from an unwarranted interference by the courts in the province of the municipal legislature. It simply follows precedent from the beginning of zoning practice. The new rule has the additional infirmity that it opens wide new fields of discretion in administrative law without any workable standards by which it is to be guided.
The lack of any principle in applying the novel theory of "amortization" betrays a fundamental weakness in the theory. Zoning, like other public programs, is not always best administered at the hands of its enthusiasts. The existence of non-conforming uses has spoiled the symmetry in the minds of zoning experts. It has bulked so large in this context that, desirable as the elimination of nonconforming uses may be, it has sometimes been presented as though it were more important than ordinary property rights. "Many means of eliminating and controlling nonconforming uses have been proposed and tried. Among these means are retroactive zoning, amortization of nonconforming uses, abatement of nonconforming uses as nuisances, public purchase and eminent domain, prohibition of *574 the resumption of a nonconforming use after a period of discontinuance, and refusal to provide governmental services to nonconforming users" (1951 Wis. L. Rev. 687). This Wisconsin Law Review article points out how most of these different proposals have been tried and found wanting, particularly the method by exercising the power of eminent domain which is said to have been discarded mainly for the reason that it is too expensive. The same is said at page 93 of Volume 102 of the Pennsylvania Law Review. The fault found with eminent domain is that it failed to achieve the object of destroying the owner's right in his property without paying for it. Consequently the most promising legal theory at the moment is known as "amortization". This theory is discussed in some of the cases and in most of the law review articles which have been cited as upholding constitutionality of these measures. "Amortization" is explained as follows:[*] "`The only positive method of getting rid of nonconforming uses yet devised is to amortize a nonconforming building. That is, to determine the normal useful remaining life of the building and prohibit the owner from maintaining it after the expiration of that time.'" The opinion in City of Los Angeles v. Gage (p. 455) adds: "The length of time given the owner to eliminate his nonconforming use or building varies with the city and with the type of structure."
This theory to justify extinguishing nonconforming uses means less the more one thinks about it. It offers little more promise of ultimate success than the other theories which have been tried and abandoned. In the first place, the periods of time vary so widely in the cases which have been cited from different States where it has been tried, and have so little relation to the useful lives of the structures, that this theory cannot be used to reconcile these discordant decisions. Moreover the term "amortization", as thus employed, has not the same meaning which it carries in law or accounting. It is not even used by analogy. It is just a catch phrase, and the reasoning is reduced to argument by metaphor. Not only has no effort been made in the reported cases where this theory has been *575 applied to determine what is the useful life of the structure, but almost all were decided under ordinances or statutes which prescribe the same time limit for many different kinds of improvements. This demonstrates that it is not attempted to measure the life of the particular building or type of building, and that the word "amortization" is used as an empty shibboleth. This comment applies to the ordinance at issue on this appeal. There could be no presumption that all junk yards, all auto wrecking or dismantling establishments, and all improvements assessed for tax purposes at not more than $500 will or have any tendency to depreciate to zero in three years. This shows that the ordinance in suit could not possibly have been based on the amortization theory.
Moreover this theory, if it were seriously advanced, would imply that the owner should not keep up his property by making necessary replacements to restore against the ravages of time. Such replacements would be money thrown away. The amortization theory would thus encourage owners of nonconforming uses to allow them to decay and become slums.
Although the courts of other States are divided on this question, the better reason seems to me to be on the side of the rule heretofore established in this State, wherefore I vote to affirm.
Order reversed, etc.
NOTES
[*] Crolly and Norton, Termination of Nonconforming Uses, 62 Zoning Bulletin 1, Regional Plan Assn., June, 1952, quoted in City of Los Angeles v. Gage, supra, pp. 454-455.